James P. SMITH, Plaintiff–Appellant,

v.

CHRYSLER CORPORATION,
Defendant–Appellee.

No. 97–1572.

United States Court of Appeals,
Sixth Circuit.

Argued June 18, 1998.

Decided Sept. 15, 1998.

10. Employees Connie Robinson, Treasure Chestnut and Bonnie Wilson. J.A. at 293.

Willis R. Davis (briefed), James J. Raftery (argued), Raftery & Associates, Southfield, MI, for Plaintiff–Appellant.

K.C. Hortop (briefed), Chrysler Corp., Highland Park, MI, Margaret A. Suma (argued and briefed), Chrysler Motors Corp., Auburn Hills, MI, for Defendant–Appellee.

Before: MOORE, CLAY, and GILMAN, Circuit Judges.

GILMAN, J., delivered the opinion of the court, in which MOORE, J., joined. CLAY, J. (pp. 809–810), delivered a separate concurring opinion.

## OPINION

GILMAN, Circuit Judge.

Within a year after being hired as an electrician by Chrysler Corporation, James P. Smith was fired for failing to disclose that he suffered from a narcoleptic-like sleeping disorder on his job-related medical forms. Smith brought suit against Chrysler on the basis that the reason given for firing him was a pretext designed to mask unlawful discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Michigan Handicappers' Civil Rights Act ("MHCRA"), MICH. COMP. LAWS ANN. § 37.1101, *et seq.* (West 1997). The district court granted summary judgment in favor of Chrysler, finding that the latter's good faith belief that Smith had lied on the medical forms shielded it from liability. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

Smith began experiencing symptoms relating to his sleeping disorder in 1989. While driving home late at night, Smith would suddenly find that he missed his turn off the road without being able to completely recall having driven the last mile or so. After experiencing a number of these episodes, Smith went to Sleep and Respiratory Associates of Michigan, P.C. ("sleep disorder clinic") in April of 1990 to determine their cause.

In conjunction with seeking treatment from the sleep disorder clinic, Smith completed a questionnaire titled "Clinical Data Base: History." In this questionnaire, Smith noted that he was "falling asleep while driving," had driven onto the shoulder of the road "many times" because of sleepiness, had experienced episodes of "fighting sleep" on his way home, and occasionally had hallucinations. Smith later testified that he used the words "sleep" and "sleepiness" for lack of a better word to describe his symptoms. As explained in his brief, "[these episodes] were not really like falling asleep, in that [I] did not feel drowsy or tired before the incident, but that they were not really like blacking out either, because immediately after the incidents, [I] thought about it, and could recall certain things that happened."

At the sleep disorder clinic, Smith was treated by Steven Miller, a physician's assistant working under the supervision of Dr. Harvey Organek. To help diagnose the type of sleep disorder from which Smith suffered, Miller had him undergo a polysomnography, a type of sleep proficiency test. The results of this test were inconclusive. Although Smith met some of the criteria associated with narcolepsy, he did not meet all of the disorder's classic textbook symptoms. Narcolepsy is defined in DORLAND'S MEDICAL DICTIONARY as a sleeping disorder of unknown etiology characterized by "recurrent, uncontrollable, brief episodes of sleep, often associated with hypnagogic hallucinations, cataplexy, and sleep paralysis." (28th ed.1994). After evaluating the results of the sleep proficiency test, Miller informed Smith that, although he did not have narcolepsy, he probably suffered from a variant of the disorder and, hence, would be treated as though he were narcoleptic. Miller then prescribed

doses of Ritalin and Cylert to aid in treating Smith's otherwise unspecified sleep disorder. Both drugs are typically used in the treatment of narcolepsy. The combined drug treatment was initially successful in alleviating Smith's symptoms.

More than three years after first visiting the sleep disorder clinic, Smith applied for a job as an electrician at Chrysler's Sterling Heights assembly plant. In completing his job application for the position, Smith was asked to fill out a "Self–Administered Medical History" form. On this form, Smith checked "no" to the question of "Have you ever had or have you now unusual tiredness or fatigue?" Smith later testified that he checked "no" because his brief episodes were never caused by fatigue or tiredness; rather, they would occur without warning whenever his mind was not completely focused on a task or activity.

Smith was also given a drug test as part of his job application. In taking this drug test, Smith was asked to complete a consent form titled "Pre–Employment Screening and Release of Liability." On this form, Smith disclosed that he had used or ingested the drugs Cylert or Ritalin within the past ninety days. During the subsequent physical examination, Smith claims that he discussed one or both of these medications with Chrysler's company doctor, Dr. Richard Rood. Smith also states that he told Dr. Rood that a doctor from the sleep disorder clinic said that Smith "might have had a mild case of narcolepsy." Dr. Rood, however, had no recollection of discussing either medication or sleeping disorders with Smith during the physical exam.

After Smith completed these forms and a series of tests, Chrysler hired him as an electrician on August 10,1993. Smith was placed on the 4 p.m. to 12:30 a.m. evening shift. By all accounts, Smith's work while at Chrysler was exemplary. In February of 1994, Smith was told by his immediate supervisor to obtain a plant driver's license so that he could use the company's electric carts to get from one end of the plant to the other whenever the power was shut down. The license also entitled Smith to operate a wide variety of heavy machinery. In order to obtain the license, Smith was required to

complete a "Driver's License Examination" form. On this form, Smith checked "no" to the question "Have you ever had narcolepsy?"

In the meantime, Smith's narcoleptic-like episodes had resurfaced in November of 1993. Smith went to the sleep disorder clinic a few months later for help in controlling his symptoms. Upon· examining Smith, Miller concluded that a further sleep proficiency test as well as a multiple sleep latency test might prove useful in conclusively determining whether Smith suffered from narcolepsy. In order to validate the results of these tests and to help in treating Smith's condition, Miller advised Smith that he needed to change his work hours to a regular daytime schedule. Dr. Organek wrote Dr. Rood a letter to that effect on May 11, 1994, requesting that Smith be moved to a "regular day work shift" due to a "medical necessity." Dr. Organek further explained that Smith was under his care "for a medical condition related to a sleep/wake disorder."

After Dr. Rood received this letter, Smith met with him on May 18, 1994 at the plant's medical facility to personally request a shift change. Dr. Rood made the following entry in his medical chart for that day:

> Comes in wanting day shift—states narcoleptic since 1989 & before[.] Takes Ritalin—lives in Milford & worried re[garding] drive home @ 1:30 am. Then has to get up @ 7 or 8 with kids or to do errands. Does OK as long as he's busy. Diagnosed by Dr. Organek. Will bring in letter. No admission of this on NH [new hire] physical.

When Chrysler did not respond to his request that Smith's work hours be changed, Dr. Organek sent another letter to Dr. Rood on June 16, 1994. The body of the letter reads as follows:

> The above referenced patient is under my care for treatment of Narcolepsy. An important consideration in the care of these patients is a regular sleep and wake schedule. I sent you a letter on May 11, 1994 requesting that the patient be allowed to work a regular day shift as this would provide him with significant benefit in terms of normalizing his sleep/wake schedule, maintaining his wakeful-

ness, and facilitating the treatment of his Narcolepsy Syndrome.

> This recommendation is made for reasons of medical necessity and not for the convenience of the patient. I would again make the request that he be placed on regular day work shift.

> Questions with regard to the above may be directed to my attention.

It was later revealed during discovery that Miller actually authored both letters, with Dr. Organek simply signing off on his proposed drafts. Miller testified that he made a definitive diagnosis of narcolepsy in the June 16 letter in order to provide Dr. Rood, who Miller said was unfamiliar with "all the different types of disorders of excessive somnolence," a readily understood thumbnail sketch of Smith's sleeping disorder. Miller maintained, however, that Smith cannot definitively be said to suffer from narcolepsy because he does not meet all the criteria necessary to make such a diagnosis. Instead, Miller testified that Smith, at most, suffers from a "variant of narcolepsy."

Shortly after receiving the June 16 letter, Dr. Rood telephoned Dr. Organek to inquire about Smith's dates of treatment and why Dr. Organek felt that a move to the day shift was imperative. Dr. Organek responded that the shift change was warranted because he felt Smith had narcolepsy. Chrysler, however, never acted on Dr. Organek's or Smith's request for a shift change.

Sometime shortly after this series of requests were made, a union representative approached the plant assembly superintendent, Valerie Michael, and advised her that Smith was having difficulty staying awake while driving home at night. The record is silent as to the representative's source for this information, and Michael herself acknowledged that she did not know its basis. In any event, this communication prompted Michael to pull Smith's employment records and begin an investigation of his employment history with Chrysler. In Smith's employment file, Michael uncovered Dr. Rood's medical notes from his May, 1994 meeting with Smith, the correspondence from Dr. Organek, and the numerous forms Smith had completed during his brief tenure at Chrys-

ler. After reading these documents, Michael spoke to Dr. Rood to determine whether Smith suffered from narcolepsy. Noting the letters sent to him from the sleep disorder clinic, his own medical notes, and the information provided by Dr. Organek during their telephone conversation, Dr. Rood informed Michael that Smith did indeed suffer from narcolepsy.

Michael promptly fired Smith for lying on the self-administered medical history form and the driver's license application. This action took place on July 12, 1994. The basis for Michael's decision consisted of the two letters sent by Dr. Organek stating that Smith was being treated for narcolepsy, Dr. Rood's notation in his medical records of the conversation with Smith to the same effect, the content of Dr. Rood's telephone conversation with Dr. Organek, and her own personal belief that narcoleptics suddenly fall asleep due to unusual fatigue or drowsiness.

Smith filed suit in a Michigan state court, alleging that Chrysler's employment decision violated the ADA and the MHCRA. The case was later removed to federal district court on the basis of federal question jurisdiction pursuant to 28 U.S.C. § 1331. After completing discovery, Chrysler filed a motion for summary judgment. In granting summary judgment in favor of Chrysler, the district court held that Smith's sleeping disorder "does affect a major life activity as if he is not totally engaged during the period in which he is awake, he will fall asleep." Although the court held that Smith had established a prima facie case under the ADA, it concluded that Smith was unable to prove that Chrysler's proffered non-discriminatory reason for firing him was a pretext intended to hide unlawful discrimination. Specifically, the district court noted: "Plaintiff's claims that he did not consider his condition to be unusual, and that he was not aware of the fact that he was diagnosed with having narcolepsy are incredulous." Smith filed a motion to reconsider, arguing that the district court failed to consider all the possible ways pretext can be demonstrated. The district court denied the motion, finding that Smith was unable to demonstrate pretext under any of the alternative methods argued in his motion. This timely appeal followed.

## II. ANALYSIS

### A. Summary Judgment Standard

■■■■ We review a district court's order granting summary judgment *de novo*. *Terry Barr Sales Agency Inc. v. All–Lock Co.,* 96 F.3d 174, 178 (6th Cir.1996). Like the district court, we must view the entire record in a light most favorable to the party opposing summary judgment, and draw all reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In the end, an entry of summary judgment can only be upheld if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). For a fact to be material, it must affect the outcome of the suit; "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Proving Discriminatory Intent Under the ADA

Under the MHCRA, it is unlawful for an employer to discriminate "because of a[n employee's] handicap." MICH. COMP. LAWS ANN. § 37.1102(a) (West 1997). An employer is also required under the statute to "accommodate a handicapper for purposes of employment ... unless the [employer] demonstrates that the accommodation would impose an undue hardship." MICH. COMP. LAWS ANN. § 37.1102(b) (West 1997).

The language of the MHCRA mirrors that of the ADA. Both acts forbid an employer from discriminating on the basis of an employee's disability. *See Monette v. Electronic Data Sys., Corp.,* 90 F.3d 1173, 1178 n. 3 (6th Cir.1996) (noting that the analysis under the MHCRA parallels that under the ADA). Because resolution of Smith's ADA claim also disposes of his MHCRA claim, we will analyze this case by reference to the ADA claim.

The ADA was designed, in part, to combat the stereotypical assumptions underlying so-

ciety's views of those with disabilities. *See* 42 U.S.C. § 12101(a)(7). As noted by Senator Harkin during the passage of the ADA: "The thesis of the [ADA] is simply this: That people with disabilities ought to be judged on the basis of their abilities; they should not be judged nor discriminated against based on unfounded fear, prejudice, ignorance, or mythologies; people ought to be judged based upon the relevant medical evidence and the abilities they have." 136 Cong. Rec. S 7422–03, 7437 (daily ed. June 6, 1990) (statement of Sen. Harkin). To that end, the ADA prohibits employers from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

▪ An employee may prove discrimination based on his or her disability in two ways. The first is by putting forward direct evidence that the defendant had a discriminatory motive in carrying out its employment decision. *See Robinson v. Runyon,* 149 F.3d 507, 512–14 (6th Cir.1998) (discussing the difference between direct versus circumstantial proof in a Title VII case). Such evidence would take the form, for example, of an employer telling an employee, "I fired you because you are disabled." Because "rarely will there be direct evidence from the lips of the defendant proclaiming his or her ⋯ animus,"*id.,* employees have a second method to prove discrimination: the indirect burden-shifting approach first articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). It is by this latter route that Smith seeks to prove his ADA claim.

▪ Under the indirect evidence method, the employee must first establish a prima facie case of discrimination. *Monette,* 90 F.3d at 1186. Once the employee successfully makes out a prima facie case, a mandatory presumption of discrimination is created and the burden shifts to the employer to proffer a non-discriminatory reason for discharging the employee. *Id.* at 1178, 1186. If the employer is able to sustain its burden, then the mandatory presumption evaporates into a permissive inference, and the burden shifts

back to the employee to show by a preponderance of the evidence that the employer's proffered reason for discharge was actually a pretext intended to hide unlawful discrimination. *Id.* While the burden of production shifts back and forth between the parties under the *McDonnell Douglas* framework, the ultimate burden of proving that the employer discriminated against the employee on account of his or her disability remains at all times with the employee. *Monette,* 90 F.3d at 1186–87.

Chrysler does not challenge the district court's holding that Smith had established a prima facie case of discrimination under the ADA. Smith similarly concedes that Chrysler proffered a non-discriminatory reason for firing him, *i.e.,* that he lied on various job forms wherein he stated that he was not narcoleptic and had not suffered from unusual fatigue. This appeal therefore focuses on Smith's challenge to the legitimacy of Chrysler's proffered reason for firing him. In Smith's view, the evidence in the record demonstrates that: (1) he did not, from a medical standpoint, actually suffer from narcolepsy, but rather from a sleeping disorder very similar to narcolepsy; (2) his sleeping disorder was neither caused by nor associated with symptoms of unusual fatigue; (3) he disclosed up front to Dr. Rood that he was narcoleptic when he first applied for a job at Chrysler in 1993; (4) the timing of Chrysler's investigation into his employment history was suspiciously close to his request for a change in working hours to accommodate his sleeping disorder; and (5) Chrysler's investigation was ill-informed and shoddy, as Michael failed to make any attempt to personally interview him or his treating physicians, or attempt to educate herself on the subtle nuances surrounding sleeping disorders in general and his condition in particular. In light of this evidence, Smith claims that a jury should determine whether Chrysler's reason for firing him was pretextual.

## C. Proving Pretext Under the ADA

▪ An employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never

used in the past to discharge an employee. *Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876, 883 (6th Cir.1996). In challenging an employer's action, an employee "must demonstrate that the employer's reasons (*each of them*, if the reasons independently caused [the] employer to take the action it did) are not true." *Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 676 (7th Cir. 1997) (emphasis added).

In this case, Smith has marshalled the above-mentioned evidence in an attempt to fit within all three methods of proving pretext. Despite this attempt to neatly segregate his proof, all of it ultimately boils down to a single argument challenging the decisional process Chrysler followed in deciding to fire him. The essence of this argument is as follows: If Chrysler had made an attempt to probe further when conducting its investigation, such as by talking to Smith or reading medical literature on the nature of sleeping disorders, then it would have learned that Smith did not have narcolepsy or suffer from unusual fatigue and, hence, did not lie on his job forms. Alternatively, Smith notes that he disclosed up front that he was narcoleptic when he first applied for a job at Chrysler; so if Chrysler had conducted a more in-depth inquiry, it would have learned that the impact of his false responses on the job forms was muted by this earlier disclosure. The discriminatory linchpin to Smith's argument is that Chrysler consciously refused to make an effort to uncover this evidence because it wanted to fire him after it learned he had a disability. The basis for this "sticking its head in the sand" argument is that the investigation was conducted almost immediately after Smith requested an accommodation for his disability and that the facts uncovered were judged using stereotyped assumptions.

Chrysler responds to this argument by urging us to adopt the so-called "honest belief" rule. This rule, as developed in a series of Seventh Circuit decisions, provides that so long as the employer honestly believed in the proffered reason given for its employment action, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless. *See Kariotis*, 131 F.3d at 676; *McCoy v. WGN Continental Broad. Co.*, 957 F.2d 368, 373 (7th Cir.1992); *Pollard v. Rea Mag-net Wire Co.*, 824 F.2d 557, 559–560 (7th Cir.1987). The rationale behind the rule is that the focus of a discrimination suit is on the intent of the employer. If the employer honestly, albeit mistakenly, believes in the non-discriminatory reason it relied upon in making its employment decision, then the employer arguably lacks the necessary discriminatory intent. "In other words, arguing about the accuracy of the employer's assessment is a distraction because the question is not whether the employer's reasons for a decision are '*right*' but whether the employer's description of its reasons is *honest.*'" *Kariotis*, 131 F.3d at 677 (quoting *Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir.1992)).

The Seventh Circuit, however, apparently does not require an employer to demonstrate that its belief was reasonably grounded on particularized facts that were before it at the time of the employment action. Instead, for the rule to apply, the employer need only provide an honest reason for firing the employee, even if that reason had no factual support. *See Pollard*, 824 F.2d at 559 (noting that "if you honestly explain the reasons behind your decision, but the decision was ill-informed or ill-considered, your explanation is not a 'pretext.'"). We find such an abstract application of the rule to be at odds with the underlying purpose behind the Act—*i.e.*, that employment actions taken regarding an individual with a disability be grounded on fact and not "on unfounded fear, prejudice, ignorance, or mythologies." 136 Cong. Rec. S 7422–03, 7437 (daily ed. June 6, 1990) (statement of Sen. Harkin). To the extent the Seventh Circuit's application of the "honest belief" rule credits an employer's belief without requiring that it be reasonably based on particularized facts rather than on ignorance and mythology, we reject its approach.

■ Although this circuit has not previously addressed whether the version of the "honest belief" rule articulated by Seventh Circuit should be applied in the ADA context, a variant of the rule has been applied in the Rehabilitation Act context. *See Pesterfield v. TVA*, 941 F.2d 437, 443–44 (6th Cir.1991). Because "[t]he analysis of claims under the

ADA roughly parallels those brought under [the Rehabilitation Act]," *Monette,* 90 F.3d at 1177, we find the form of the "honest belief" rule employed in *Pesterfield* to be particularly relevant in the ADA context.

In *Pesterfield,* an employee sued his employer for its refusal to clear him as medically able to return to work after he was hospitalized for the treatment of a psychological disability. After losing below, the employee argued on appeal that he had proved that the employer's reason for firing him was discriminatory. The employee claimed that the basis for the employer's decision (its interpretation of a letter it had received from the employee's treating psychologist) was mistaken. As support for his argument, the employee introduced the testimony of his treating psychologist. The psychologist testified that his letter had been misinterpreted by the employer and that the employee was in fact fully able to return to work at the time he wrote the letter. The employer responded that its good faith reliance on its interpretation of the psychologist's letter precluded a finding that it had discriminated against the employee.

This court agreed. In analyzing the employee's argument, the court noted that "[t]he question is thus not whether TVA's decision that plaintiff was not employable due to his psychiatric condition was correct measured by 'objective' standards. What is relevant is that TVA, in fact, acted on its good faith belief about plaintiff's condition based on Dr. Paine's opinion, and, as the district court pointed out, *there is no proof to the contrary.*" *Pesterfield,* 941 F.2d at 443 (emphasis added). In deciding whether the employer's reason for its employment decision was made in good faith, this court stressed that the employer had a reasonable basis for reaching its conclusion. As noted by the court:

> TVA's medical staff reasonably relied upon the medical report of plaintiff's private psychiatrist and reasonably interpreted its contents. Plaintiff has failed to prove that TVA's decision to terminate him was based upon a stereotyped attitude toward persons with psychological handicaps rather than upon a reasoned and medically supported judgment that plaintiff could not be returned to work safely under any accommodation that TVA could make.

941 F.2d at 443–44.

Thus, according to *Pesterfield,* in order for an employer's proffered non-discriminatory basis for its employment action to be considered honestly held, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made. If the employer is unable to produce such evidence to support its employment action, then the "honest belief" rule does not apply. Even if the employer is able to make such a showing, the protection afforded by the rule is not automatic. As was noted in *Pesterfield,* once the employer is able to point to the particularized facts that motivated its decision, the employee has the opportunity to produce "proof to the contrary." 941 F.2d at 443. As one court noted in a similar context, "if the employer made an error too obvious to be unintentional, perhaps it had an unlawful motive for doing so." *Fischbach v. District of Columbia Dept. of Corrections,* 86 F.3d 1180, 1183 (D.C.Cir.1996) (holding that the plaintiff failed to establish that the employer's proffered nondiscriminatory reason was pretextual).

In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action. *Cf. Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (explaining that an employee establishes pretext "by showing that the employer's proffered explanation is unworthy of credence."). Although courts should resist attempting to micro-manage the process used by employers in making their employment decisions, neither should they blindly assume that an employer's description of its reasons is honest. When the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse

employment action, thereby making its decisional process "unworthy of credence," then any reliance placed by the employer in such a process cannot be said to be honestly held.

■ Applying these principles to the facts in the present case, we find that Chrysler reasonably relied on the particularized facts at hand when it determined that Smith had falsely stated on his Driver's License Examination form that he was not narcoleptic. Chrysler had before it letters from Smith's treating physician stating that Smith was being treated for narcolepsy, the medical opinion expressed by Dr. Organek during his telephone conversation with Dr. Rood that Smith suffered from narcolepsy, and Dr. Rood's medical notes indicating that Smith himself admitted to suffering from narcolepsy since 1989. The burden of production thus shifted to Smith to demonstrate that Chrysler's reliance on those facts was unreasonable. This Smith has been unable to do.

Chrysler's conclusion that Smith suffered from narcolepsy was based on its consideration of the medically informed opinions of those with knowledge about narcolepsy in general and Smith's disorder in particular—Smith himself and his treating physician. Given the amount and the source of information that the investigation uncovered, we are satisfied that Chrysler was diligent in investigating the matter. Nor can we say that Chrysler's reliance on or interpretation of the medical opinion from Smith's own treating physician was unreasonable. Just as the employer's reliance on the treating psychologist's letter in *Pesterfield* was found to be reasonable, so too was Chrysler's reliance on the medical opinion provided by Smith's treating physician that Smith was narcoleptic.

■ The same cannot be said, however, about Chrysler's belief that Smith lied when he put on his Self–Administered Medical History form that he had never suffered from unusual tiredness or fatigue. Chrysler's belief that Smith lied in this regard was not the result of any particularized facts uncovered during its investigation; rather, it was based solely on Michael's personal opinion that people with narcolepsy suffer from unusual fatigue. The only stereotype-free basis upon which Michael could have formed such an opinion is the single communication from the union representative that Smith complained of falling asleep while driving home after work.

In fact, Smith did not "fall asleep" at the wheel as that phrase is commonly understood. The essential characteristic of narcolepsy is that afflicted individuals suddenly and uncontrollably lapse into a sleep-like state for a brief interval, typically when their mind is not focused on some task or activity. *See* HARRISON'S PRINCIPLES OF INTERNAL MEDICINE 129 (9th ed.1980). Fatigue, in contrast, is defined as "weariness or exhaustion from *labor, exertion,* or *stress.*" MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 424 (10th ed.1997) (emphasis added). Similarly, the word tiredness appears to be nothing more than a synonym for fatigue. The dictionary confirms that tiredness means "drained of strength and energy: *fatigued often to the point of exhaustion.*" MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1237 (10th ed.1997) (emphasis added). Tiredness and fatigue, thus defined, do not even remotely cover the situation experienced by narcoleptics. Finally, in her conversations with Dr. Rood, Michael never attempted to validate her personal opinion by inquiring about whether narcoleptics suffer from unusual fatigue.

The essential question, however, is not whether narcoleptics suffer from unusual fatigue, but whether Chrysler had a reasonable basis to believe that Smith had lied when he checked "no" to the question "Have you ever had or have you now unusual tiredness or fatigue?" Given the general understanding of the terms "tiredness" and "fatigue" as defined in the dictionary, as opposed to the unknown etiology of narcolepsy and its accompanying symptoms, we find that Chrysler could not have reasonably believed that Smith had lied (based solely on the comment of the union representative) without further investigation.

Chrysler, on the other hand, seeks to provide factual support for Michael's belief by pointing to the medical questionnaire that Smith completed when he first sought treatment at the sleep disorder clinic. Specifically, Chrysler notes that Smith stated in the questionnaire that he struggled to stay

awake and had to "fight sleep" while driving. While Smith's own answers to the clinic's medical questionnaire would certainly provide a reasonable basis for Michael's belief, Chrysler overlooks one essential detail: *Michael did not have the information contained in the questionnaire before her when she made her decision.* Just as Smith may not take advantage of the private conversations he had with his treating physicians in challenging Chrysler's belief that he lied when he said he was not narcoleptic, Chrysler cannot use the 20/20 hindsight provided by the clinic's questionnaire to buttress its own belief that Smith lied when he stated he had never suffered from unusual fatigue.

Without the benefit of any particularized facts to support its belief that Smith lied when he filled out the Self–Administered Medical History form, Chrysler is left with Michael's own incorrect, stereotyped assumption that all narcoleptics suffer from unusual fatigue. As noted earlier, the ADA requires an employer to make a stereotype-free assessment based on facts rather than mythology in reaching employment decisions. Having failed to do so with respect to its reason for believing Smith had lied on the medical form in question, it cannot be said that Chrysler's belief was honestly held as to this alternative justification for its employment action.

Despite Chrysler's misplaced reliance on Smith's Self–Administered Medical History form, it did have a reasonable basis to believe that Smith had lied on his Driver's License Examination form for the reasons previously stated. Smith has thus been unable to overcome one of Chrysler's nondiscriminatory reasons for firing him. *See Kariotis v. Navistar Int'l Trans. Corp.,* 131 F.3d 672, 676 (7th Cir.1997) (An employee "must demonstrate that the employer's reasons (each of them, if the reasons independently caused [the] employer to take the action it did) are not true").

■ On the other hand, we wish to point out that an employer's strategy of simply tossing out a number of reasons to support its employment action in the hope that one of them will "stick" could easily backfire. "There may be cases in which the multiple grounds offered by the defendant for the adverse action of which the plaintiff complains are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment." *Russell v. Acme–Evans Co.,* 51 F.3d 64, 70 (7th Cir.1995). Thus a multitude of suspicious explanations may itself suggest that the employer's investigatory process was so questionable that any application of the "honest belief" rule is inappropriate.

Such a concern, however, is not present in the case before us. The doubt raised over Chrysler's second alternative justification for firing Smith does not translate into an inference that the true motivation behind Smith's discharge was his disability. The two justifications and the sources from which they were derived were separate in nature: one related to whether Smith suffered from narcolepsy, which was answered by reasonably relying on the opinions of Smith himself and his treating physician, while the other involved a more specific judgment on the disorder's particular symptoms that was based on the employer's own subjective opinion. Chrysler's misjudgment as to the latter does not drag down its more general and medically supported conclusion concerning the former. The district court therefore did not err in granting summary judgment in favor of Chrysler due to Smith's inability to show pretext.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

### CONCURRENCE

CLAY, Circuit Judge, concurring.

I concur with the majority's decision to affirm the district court's judgment. However, I write separately because I disagree with the majority's holding that Chrysler could not have reasonably believed that Smith lied on his Self–Administered Medical History ("SAMH") form when he indicated that he had never suffered from "unusual tiredness or fatigue."

The majority states that Chrysler (Michael) could not have reasonably believed

that Smith had lied on the SAMH form, "[g]iven the general understanding of the words 'tiredness' and 'fatigue' as defined in the dictionary as opposed to the unknown etiology of narcolepsy and its accompanying symptoms, ... (based solely on the comment of the union representative) without further investigation." I disagree with the majority's conclusion for three reasons.

First, I fail to see how the fact that narcolepsy may be a disease of unknown etiology (origin or source) has any relevance to the matter at hand. The origin or source of the disease is not at issue. Rather, it is the clinical manifestations of the disease for which we take notice; namely, "uncontrollable sleepiness", *see* ISSELBACHER ET AL., HARRISON'S PRINCIPLES OF INTERNAL MEDICINE 129 (9th ed.1980), and whether it is reasonable for a lay person to believe that someone afflicted with this disease should answer affirmatively when asked if they suffer from "unusual tiredness or fatigue."

In addition, although I agree with the majority's reliance on Harrison's Principles of Internal Medicine as a source of reference for medical conditions, I disagree with the majority's interpretation of Harrison's description of narcolepsy. A more thorough reading of Harrison's description of the characteristics of this disease indicates:

> The essential characteristic of narcolepsy is uncontrollable sleepiness. Many times a day the individual is assailed by an uncontrollable desire to sleep. The eyes close, muscles relax, breathing slows, and the person appears to be dozing. A noise or a touch is enough to awaken these individuals, and they may feel refreshed momentarily. As a rule the condition begins in adolescence or early adult life. The periods of sleep may occur at any time of day, especially when the patient is physically inactive. The impulse to sleep is so insistent that the victim may be unable to sit through a single class in school or a meeting without at once falling asleep. A given period of sleep usually lasts up to 15 min, seldom as long as an hour unless lying down. At the onset, there may be blurring of vision, diplopia, and ptosis which may raise the question of an ophthalmologic disorder. The condition is often associated with cataplexy (70 percent

of cases), sleep paralysis (50 percent), and hypnagogic hallucination (25 percent).

ISSELBACHER ET AL., HARRISON'S PRINCIPLES OF INTERNAL MEDICINE 129 (9th ed.1980) (emphasis added).

Finally, I disagree with the majority's statement that Michael's belief was "based solely on the comment of the union representative." Michael's belief was also grounded on a lay person's common understanding of this disease and, based upon the thorough description from Harrison's, as noted above, I find her belief to be reasonable and based upon fact as opposed to unfounded stereotype.

Therefore, although I agree that the district court properly granted Chrysler's motion for summary judgment and would therefore affirm the court's judgment, I believe that each of the reasons given by Chrysler for Smith's discharge were legitimate and non-discriminatory.