SUHRHEINRICH, Circuit Judge,
concurring in part and dissenting in part.
I agree that the district court properly denied Peck’s motion for leave to amend her complaint to include a public policy tort of refusal to hire. I further agree that Peck has made a prima facie showing that Elyria’s failure to hire her was motivated by Peck’s gender. However, Elyria has proffered legitimate, nondiscriminatory reasons for its decision not to hire Peck, and Peck has failed to demonstrate that those reasons were pretextual. Accordingly, I would affirm the district court’s order granting summary judgment on Peck’s Title VII claim.
I.
The majority holds that summary judgment is inappropriate in this case because Elyria’s contradictory explanations for refusing to hire Peck were indicative of pretext and because Peck’s job application was treated differently from men’s job applications. Both reasons are problematic.
As to the issue of whether Elyria offered conflicting reasons for not hiring Peck, Elyria offered five reasons for choosing not to immediately hire Peck. First, Denise Sprague, Elyria’s director of human resources, did not consider Peck for the grinder position because Sprague believed, based upon Supervisor Greg Ganig’s account of Peck’s prior work performance at another foundry, that Peck had the beginnings of carpal tunnel syndrome. Second, Sprague also did not consider Peck for the grinding position based upon Ganig’s explanation that Peck had “trouble getting to work because of ... [h]er car [and] her children.” (JA 194.) Third, Sprague did not immediately consider Peck for the tow motor position because it was already filled. Fourth, Sprague continued to consider Peck’s application for other suitable openings but chose to defer any further action on Peck’s application until Elyria could complete a renovation of women’s facilities in the foundry. And fifth, while *149 Sprague was holding Peck’s application for consideration once a suitable position opened and the bathrooms were renovated, she took no further action on Peck’s employment application after receiving a letter from Peck’s attorney threatening to sue for gender and racial discrimination.
To survive summary judgment, Peck had to show that Elyria’s proffered reasons were pretextual. Peck can demonstrate pretext by showing that Elyria’s proffered reasons: (1) have no basis in fact; (2) did not actually motivate the refusal to hire; or (3) are insufficient to explain the refusal to hire. See Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir.2001).
Here, neither party disputes that there were no open tow motor positions when Peck applied, so any argument that Elyria failed to hire Peck for the tow motor position is a nonstarter. Peck also fails to demonstrate, under any of the three methods cited above, see Dews, 231 F.3d at 1021, that Elyria’s reasons for refusing to consider her for a grinder position were pretextual. As to the first method of demonstrating pretext, Elyria’s decision to reject Peck for the grinder position because of Peck’s medical problems has a basis in fact. Peck does not dispute that she was removed from a previous grinding job because of medical debilitations in her arms. Similarly, Peck concedes that she briefly encountered problems with transportation and childcare while employed at General Castings, which was another reason that Elyria chose to defer consideration of Peck’s application.
As to the second method, even though Peek had previous foundry experience, she was removed from a grinding position because of medical problems. Elyria was aware of these facts when it chose to reject Peck for the position, and the fact that Peck was removed from that same position by a former employer because of medical issues was a reasonable motivation for Elyria to reject Peck for grinding. And regarding the third method, Peck fails to demonstrate that her previous medical problems and removal from a grinding position were insufficient reasons for rejecting her for the position. Peck acknowledges that she had suffered debilitations in her arms that spurred her removal from a grinding position. In sum, Peck has failed to demonstrate that Elyria’s decision to reject her for a tow motor or grinding position was driven by a discriminatory motive.
However, the inquiry does not end there because Elyria also proffered that it was continuing to consider Ms. Peck for other positions — at least as a tow motor operator (see JA 66) — but that Elyria put Peck’s application aside temporarily because it was in the process of updating its women’s bathroom and locker room facilities. Peck’s argument rebutting Elyria’s “women’s facilities” reason is as follows: Peck argues that because Title VII was enacted decades ago, Elyria’s failure to have adequate facilities is illegal, and Elyria “should not be able to stand behind a decision based on a ‘justification’ which is in violation of the law.” (App Br 15.)
Again, Peck fails under any of the three methods to demonstrate pretext. First, Peck’s attempt to cast doubt on Elyria’s “women’s facilities” reason overlooks the undisputed fact that Elyria was in the beginning process of renovating its women’s facilities around the time of Peck’s application. Accordingly, the reason has a “basis in fact.” Indeed, Elyria’s plans to update its facilities actually support its claim that it intended to hire women. See, e.g., Bruno v. City of Crown Point, Indiana, 950 F.2d 355, 362 n. 6 (7th Cir.1991) (noting that an employer currently constructing new women’s restrooms “[i]f *150 anything, ... was evidence that the department anticipated hiring women.”).
Regarding the second method, Elyria has never wavered from its position that it was choosing to wait on Peek’s application, in part, until it had adequate bathroom facilities for women. As it was already in the process of renovating those facilities, it was not unreasonable for Elyria to delay further consideration of Peck’s application until the deficiencies in its facilities were fixed.
And as to the third method, Peck fails to show that waiting for the bathrooms to be finished is insufficient to explain the delay in contacting her for an available position. According to Elyria, women had inadequate locker room, shower, and bathroom facilities, requiring female employees to use the bathroom on one floor and wash their hands on another floor. (JA 215.) Further, neither party disputes that Elyria was in the early stages of renovating the women’s facilities to address these issues during the summer that Peck submitted her application. And Elyria explains that it was holding Peck’s application for consideration once the bathrooms were completed. Therefore, it was not because of Peck’s gender that Elyria failed to consider her, but because Elyria was devoting its resources to ensuring that women would have proper facilities to use before asking Peck for an interview. Elyria’s decision to wait on Peck’s application until the renovations were completed sufficiently explains why Peck was not immediately contacted for an interview. Therefore, Peck has failed to satisfy any of the three methods for demonstrating that Elyria’s decision to hold Peck’s application until the facilities were renovated is pretextual.
The majority finds Sprague’s initial hesitation to interview Peck for a grinding position irreconcilable with Sprague’s further explanation that she was continuing to consider Peck for other suitable positions. According to the majority, Sprague had received “damning input” from a former coworker, Greg Ganig, about Peck, which was reason enough to discontinue consideration of Peck’s application. If the attendance issues Ganig mentioned had dissuaded Elyria from considering Peck for the grinding position, the majority concludes that the fact that Elyria continued to consider Peck in the face of Ganig’s comments raises credibility concerns about Sprague. The “damning input” to which the majority refers can be found in the depositions of Sprague and Ganig, who both testified that Ganig actually thought Peck was “a good worker” who had problems with her arms and had trouble getting to work because of problems with her car and childcare. {See JA 192; Sprague Dep 97-98.)
In Smith v. Chrysler Corp., 155 F.3d 799 (6th Cir.1998), this Court acknowledged that “[tjhere may be cases in which the multiple grounds offered by the defendant for the adverse action of which the plaintiff complains are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment.” Smith, 155 F.3d at 809 (internal quotation marks and citation omitted). The Smith Court also explained that it is up to the plaintiff to “demonstrate that the employer’s reasons {each of them, if the reasons independently caused [the] employer to take the action it did) are not true.” Id. at 806 (internal quotation marks and citation omitted). In Smith, though the plaintiff offered evidence rebutting one of employer’s two proffered nondiscriminatory reasons, the Court held that casting doubt on one of the reasons did not cast doubt on the other because the “two justifications and the sources from which they were *151 derived were separate in nature.” Id. at 809.
Here, the nondiscriminatory reasons Elyria gave are “separate in nature.” Even if Sprague was concerned about Peck’s temporary attendance issues at her previous job, that concern does not preclude Sprague from revisiting Peck’s application once a suitable position opened and then inquiring whether Peck had solved the transportation and childcare problems. Indeed, Peck goes to great lengths to show that Elyria hires employees with, in Peck’s opinion, less than sterling employment histories. (See, e.g., App Br 23-26.) Sprague similarly continued to consider Peck even though Ganig mentioned that Peck had attendance problems — which Peck herself argues were temporary and easily remedied — at her prior job. (See App Br 19.) Therefore, it was perfectly logical for Sprague to hold Peck’s application until suitable positions opened. Had Sprague stopped considering Peck after Ganig explained that she had transportation and childcare problems, the majority presumably would find no inconsistency and, thus, no pretext. To the majority, the fact that Elyria has consistently maintained that it was keeping Peck’s application active for suitable openings, despite Ganig’s opinion, is illustrative of pretext. However, Elyria’s decision not to immediately consider Peck for a grinding position based, in part, on her temporary transportation and childcare issues while at her previous job is not so “fishy and suspicious” as to cast doubt on Elyria’s decision to consider Peck for other positions in the future. The main reason Elyria has proffered for rejecting Peck for the grinding position has always been that Elyria believed Peck had the beginnings of carpal tunnel.
More to the point, Elyria consistently maintained that it was continuing to consider Peck until a tow motor position opened and Elyria had renovated the women’s facilities. Neither of those events occurred before Peck’s attorney sent the letter, which Sprague believed was the beginning of legal action (see JA 52) and prompted Elyria to cease further action on Peck’s application. Therefore, it is impossible to infer those reasons given were pretextual given the record as developed.
Further, Peck never argues in her brief to this Court that Sprague’s proffered reasons were inconsistent or irreconcilable. In fact, in her own affidavit and brief, Peck corroborates Sprague’s explanation that Elyria was still considering Peck for employment until Peck’s attorney threatened legal action. (See JA 115; App Br 19-20, 26-27.) Also undisputed, Sprague herself inquired of Peck’s former supervisor about Peck’s suitability for work at Elyria. And it was Sprague, who noticed Peck in Elyria’s parking lot waiting to pick up another employee, who proactively approached Peck to let her know that she was still being considered for a position and would be contacted after Sprague got “a few things in order,” (JA 231), referring to the women’s facilities (id.). Logically, Sprague would not have taken any of these actions had she not been considering Peck for employment. Sprague’s actions, combined with undisputed testimony that Elyria was renovating the women’s facilities in anticipation of hiring more females, show that Peck was still being considered for employment, and that Elyria ceased further consideration of Peck’s application not because she was female but because Peck’s attorney sent the letter threatening legal action.
The majority cites Cicero v. Borg-Warner Auto., Inc., 280 F.3d 579, 592 (6th Cir.2002), for the proposition that an employer’s changing rationale for making an adverse employment decision can be evi *152 dence of pretext. Cicero is inapposite here. In Cicero, the employer provided one reason in interrogatories, another in a deposition, and yet another at the summary judgment stage for its decision to discharge the plaintiff. Id. No such inconsistency occurred here. As quoted above, Sprague’s testimony that she did not immediately consider Peck for grinder or tow motor but chose to “set aside” Peck’s application for further consideration once the women’s facilities were completed and a suitable position opened is unrebutted and unchanging through Sprague’s deposition, Elyria’s responses to Peck’s interrogatories, and at the summary judgment stage.
In sum, Peck has not called into doubt any of the five reasons given for deferring action on her job application. As such, Peck has failed in her burden of showing that Elyria’s proffered reasons for not hiring her were masking any discriminatory animus. And her claim must, as the district court properly held, fail.
II.
The majority also holds that Elyria treated Peck’s employment application differently than men’s applications. The majority explains that, at least sometimes, Elyria hired men for positions that differed from what they specified in their job applications and, therefore, Elyria’s decision to consider Peck only for employment as a grinder or tow motor operator may be indicative of gender discrimination.
As the majority finds, Peck listed “Grinder — Tomotor—?” on her application in the field titled “Position Sought.” Elyria explains that it believed Peck was seeking a position as either Grinder or Tow Motor. The majority, however, infers that the “?” implies that Peck also “wanted to be considered for positions besides tow motor operator or grinder.”
The majority holds that the question mark meant that Peck was seeking consideration for other positions besides grinder and tow motor and supports its conclusion by referencing another question mark Peck placed in the “Expected Monthly Salary or Hourly Wage” field. The majority reasons that because Peck added a “?” under salary, and no one expects that the question mark there would mean she would work for free, then somehow a question mark after “Tomotor” indicates that she wanted to be considered for jobs other than those listed. In essence, the majority takes a punctuation symbol, and turns it into a “fact,” i.e., that Peck intended to apply for other positions, and because Peck had that intent, Elyria showed discriminatory animus by not reading the application that way. However, the question mark is not a “fact,” let alone one that creates “a genuine issue of material fact” of gender discrimination or pretext. See Fed.R.Civ.P. 56(c). The question mark can mean any number of things; indeed, one dictionary definition of “question mark” is “something unknown, unknowable, or uncertain.” Webster’s Ninth New Collegiate Dictionary 966 (1988). Thus, any interpretation we may have is sheer speculation in the absence of any other relevant proof. The burden of bringing forth that “other relevant proof’ is on Peck to show that Elyria understood what Peck meant by the question mark and ignored her desire to be considered for “any position” because she is a woman. Peck has not done so here.
Instead, Peck’s complaint supports the district court’s view that Peck applied only to work as a grinder or tow motor operator. In her complaint, Peck avers that she “applied for various positions with Defendant on or about May 25, 2004,” (JA 8), but nowhere in her complaint does she allege that she was applying for any positions other than those listed. Indeed, as *153 she further explains in the same paragraph of her complaint, “Despite the fact that Plaintiff was qualified for these positions with Defendant having over five years experience in various capacities in the industry, the Defendant failed to hire her, but instead hired numerous males who were far less qualified.” (Id. (emphasis added).) Peck’s language — that she was qualified for “these” positions — indicates that she was applying for specific positions, namely the two listed on her job application, because she obviously cannot claim to be qualified for a “?” position. Therefore, it was reasonable for the district court and Elyria to believe that Peck was applying for the two positions she listed on her job application — grinder and tow motor operator.
Even if the district court and Elyria misinterpreted this confusing “?” on Peck’s job application, proving that Elyria failed to clue in to Peck’s desired employment does not prove pretext. The fact remains that Elyria had an honest and reasoned belief that Peck was applying for two specific positions because those were what Peck clearly listed on the application. And under this Court’s articulation of the “honest belief rule,” “for an employer to avoid a finding that its claimed nondiseriminatory reason was pretextual, ‘the employer must be able to establish its reasonable reliance on the particularized facts before it at the time the decision was made.’” Wright v. Murray Guard, Inc., 455 F.3d 702, 708 (6th Cir.2006) (quoting Smith v. Chrysler Corp., 155 F.3d at 806). This Court does not “miero-manage the process used by employers in making employment decisions,” nor does it require “that the decisional process used by the employer be optimal or that it left no stone unturned.” Smith, 155 F.3d at 807. Instead, our inquiry is whether Elyria “made a reasonably informed and considered decision before taking an adverse employment action.” See.id. Here, regardless of Peck’s intentions behind adding the question mark, Peck only included two words, the second of which was misspelled, on her application for positions sought. It was thus reasonable for Elyria to conclude that those were the two jobs for which Peck was applying. Peck has failed to develop the record to support the majority’s conclusion that Elyria should have considered Peck for any and all jobs it had available.
Further, Peck has not presented evidence that she qualified for the few positions that Elyria filled with applicants who did not apply for them. And choosing to wait on Peck’s application until Elyria could finish renovating the bathroom for its female employees is an unrebutted and legitimate reason for deferring on Peck’s application for any open positions. It does not follow that Elyria failed to consider Peck for “other” positions, i.e., treated Peck’s application differently, solely because Elyria chose to hold Peck’s application until Elyria believed that a suitable position was available.
In reaching its holding, the majority reasons, inter alia, that “Elyria has pointed to no evidence that the medical condition that it purportedly believed disqualified Peck as a grinder would have prevented her from holding other positions at the foundry.” However, the majority misapplies the law in this Circuit by requiring Elyria to provide “evidence that the medical condition that it purportedly believed disqualified Peck as a grinder would have prevented her from holding other positions at the foundry.” This Court has consistently held that once an employer articulates a legitimate reason for taking its employment decision, the burden is on the applicant, not the putative employer, to demonstrate that the proffered reason for failing to consider the applicant was pretextual. *154 See, e.g., Abdulnour v. Campbell Soup Supply Co., LLC, 502 F.3d 496, 502 (2007) (holding that once the defendant has set forth a “legitimate non-diseriminatory reason” for the adverse employment decision, the burden shifts to the plaintiff “ ‘to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination’ ”) (quoting DiCarlo v. Potter, 358 F.3d 408, 414 (6th Cir.2004)). Contrary to the majority’s reasoning, it was not for Elyria to offer a legitimate reason and then prove that it was not pretextual. See Texas Dep’t of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (“The defendant need not persuade the court that it was actually motivated by the proffered reasons” in order to fulfill its burden under the second step of the McDonnell Douglas framework.).
In the end, the question of whether Peck meant to apply for two jobs or any open job is irrelevant because Denise Sprague repeatedly and consistently testified that she was considering Peck for other jobs, but that Peck’s medical issues, the lack of available restroom facilities, and the lack of job openings prevented Peck’s immediate hire. For example, when Peck’s attorney asked why Sprague never called Peck for an interview, Sprague testified that she did not immediately call Peck because “[h] er application was based on chipping and grinding,” and because Sprague believed “she had the beginnings of carpal tunnel.” (JA 211.) Peck’s attorney then asked why Sprague considered Peck for those two positions only. Sprague replied that she did not limit her consideration to those two positions:
Q. But in your ease, you limited her to the jobs that you felt that she was— wanted to do, just grinder and tow motor operator?
A. No. That’s not true.
(JA 213 (emphasis added).) Peek’s attorney pressed the issue:
Q. I asked the question — the question that I asked you was, did you consider her for any other job, other than grinder and tow motor?
A. Her application was set aside, and until there were proper women’s facilities — it was not that I did not consider her for any other position; it was set aside.
(JA 214 (emphasis added).) Peck’s attorney asked the question again, and Sprague replied with the same answer that she was still considering Peck for other positions, but set aside her application until the women’s facilities were completed:
Q. Why wouldn’t you consider her for anything else, other than grinder and tow motor?
A. I needed to get proper facilities for the women, and it was set aside on my desk.
(JA 214.)
In other exchanges on the issue in the same deposition, Sprague explained that she was still considering Peck for other positions, but her application was set aside until the women’s facilities were completed, she did not believe she had other suitable openings, and because Peck may have had carpal tunnel:
Q. Showing you what has been marked as Plaintiffs Exhibit 15, just to go back before we get into that. And you didn’t consider her for any other jobs like yard work or anything like that?
A. Not at the time. I don’t believe I had any openings. And when she had the carpal tunnel and I didn’t *155 have the women’s facility, I was putting it on the side.
(JA 222.)
Q. Why didn’t you ever interview my client for core finishing jobs?
A. I set it aside after I found out from Gary that there was potential that she had carpal tunnel. And I also set it aside to get the locker facilities fixed. And when I got the letter [threatening legal action], I stopped.
(JA 239.)
As such, Sprague’s testimony clearly shows that Peck was being considered for “other” positions — a tow motor position at the least should one open up — and that Elyria was taking account of Peck’s muscular problems and the lack of adequate bathroom facilities in deciding what positions Peck would be best suited to perform. The record further shows that Elyria refused to consider Peck only after her attorney drafted the letter threatening to sue. Peck has not challenged the fact that she was removed from a previous grinding position for muscular problems in her arms. Nor has she refuted Elyria’s contention that it was renovating the women’s facilities. And most significantly, Peck has not introduced evidence rebutting Elyria’s contention that it was still considering Peck up to the time Peek’s attorney sent the letter. To the contrary, in her own affidavit and brief, Peck corroborates Sprague’s explanation that Elyria was still considering Peck for employment until Peck’s attorney threatened legal action. (See JA 115; App Br 19-20, 26-27.) Therefore, Peck has placed no evidence on the record that her application was treated differently than similarly situated males by failing to consider her for other positions.
III.
I agree with the majority’s conclusion that the district court analyzed only Elyria’s explanations of why it did not hire Peck for the grinding and tow motor positions. I believe, however, that Elyria adequately and undisputedly explained that it was considering Peck for other positions once its facilities were completed. And because we review the district court’s grant of summary judgment de novo, “we may affirm the judgment on grounds other than those employed by the lower court, as long as the party opposing summary judgment is not denied the opportunity to respond.” Thornton v. Fed. Express Corp., 530 F.3d 451, 456 n. 2 (2008) (citing Carver v. Dennis, 104 F.3d 847, 849 (6th Cir.1997)). Here, for the reasons discussed above, Peck has failed to rebut Elyria’s proffered reasons for deferring consideration of her job application. Therefore, I would affirm the judgment for the reasons stated in my dissent.