NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0708n.06
Filed: August 16, 2005

No. 04-5762

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| IDA HEADY, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellant*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF KENTUCKY |
| | ) | |
| UNITED STATES ENRICHMENT | ) | **O P I N I O N** |
| CORPORATION, | ) | |
| | ) | |
| *Defendant-Appellee*. | | |

BEFORE:     MOORE and COLE, Circuit Judges; WISEMAN, District Judge[*]

**R. GUY COLE, JR., Circuit Judge.**  Plaintiff-Appellant, Ida Heady, brought this action

in federal district court alleging retaliation in violation of the Family Medical Leave Act ("FMLA"),

29 U.S.C. § 2601, et seq.  The district court granted the Defendant-Appellee, United States

Enrichment Corporation ("USEC"), summary judgment, concluding that Heady did not show that

USEC's proffered reasons for discharge were pretextual.  On appeal, Heady argues that she

presented sufficient evidence to show that she was not discharged as part of a massive reduction-in-

workforce program, as advanced by USEC, but that she was selected for discharge based on her use

of FMLA-protected leave.

---

[*]The Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle District
of Tennessee, sitting by designation.

For the reasons that follow, we **AFFIRM** the district court's grant of summary judgment to USEC.

## I. BACKGROUND

In 1989, Ida Heady accepted employment with USEC. Over the next ten years, she worked at USEC in miscellaneous positions, including various clerical positions in the Quality Assurance Department. In 1996, Heady took FMLA leave for her carpal tunnel syndrome. Two years later, in 1998, Heady accepted a transfer to the Operations division of the plant as an office manager. Heady again took FMLA leave for abdominal surgery from late 1999 to early 2000.

Heady stated that her direct supervisor, Dale Mittendorf, mentioned her "attendance" problems during a performance evaluation in 1999. According to Heady, Mittendorf stated that her "attendance was down, but improving." Heady asserts that during that time period she had absences protected by the FMLA, as well as non-FMLA absences for the death of her mother-in-law, influenza, and bronchitis. Heady could not recall any other absences.

In the spring of 2000, budgetary constraints resulted in USEC instituting a broad reduction-in-workforce plan. One-hundred and six USEC employees participated in a "voluntary workforce reduction." Twenty-six employees were involuntarily discharged.

Heady was one of three office managers in the Operations division. None of the three were willing to accept voluntary discharge. Because similar divisions in the company only had one office manager, USEC decided to eliminate one of the three office managers. To select the office manager whose position would be eliminated, USEC asked Mittendorf, Mittendorf's supervisor Mike Mack,

and Charlotte Powell, the office manager for Mack's supervisor, to rate Heady and the other two office managers.

The performance ratings system used to determine which employees would be discharged as part of the workforce reduction was different from that used in standard performance evaluations. In the past, USEC utilized a Performance Planning and Review System for semiannual evaluations of employees. In 1992, 1997, 1998, and 1999, Heady's supervisor gave her an overall rating of "effective performance." In 1991 and 1995-1996, Heady received an overall rating of "consistently exceeding" goals and expectations. For the workforce reduction, however, USEC hired a consultant to implement an evaluation specifically for the purpose of determining which employees were best suited for future employment with USEC. The consultant, Paulo Carotti, recommended and employed the "Lominger Leadership Architect Tools" evaluation ("Lominger Evaluation") for this purpose. Carotti worked with managers from USEC to develop certain "competencies" for each position within the organization. These competencies then formed the basis for the evaluation system utilized by USEC in the reduction in workforce. The purpose of the Lominger Evaluation was to identify those employees most suited for leadership and management positions. The Lominger Evaluation was intended to identify those employees who would be most suited for future promotion, but not necessarily intended to evaluate the effectiveness of employees in their current positions.

The USEC manual also addressed reductions in workforce. It outlined the following criteria for employee assessment in the event of an involuntary workforce reduction: (1) performance and demonstrated abilities, (2) relevant education and training, (3) critical skills, (4) transferability of

skills, and (5) length of service to the company. A "Candidate Selection Worksheet" was to be used for evaluating employees prior to the involuntary workforce reduction, including: (1) job profile competencies; (2) relevant education and training; (3) functional and technical job competencies, including the ability to change focus as priorities and work needs change; and (4) length of service to the company. Job profile competencies and functional and technical job competencies were rated on a five-point scale.

In determining which of the three office manager positions would be eliminated, Mittendorf, Mack, and Powell evaluated the performance of the managers. Although these three individuals did not each have information for every rating category, they met and discussed the ratings, and relied on one another for a full assessment of the three managers. Neither Mack nor Powell had significant personal contact with Heady. Because Mack did not have direct supervision over Heady, he relied on Mittendorf for ratings outside his personal knowledge. Powell also relied on Mittendorf's assessment of some of Heady's competencies, but noted that Heady did not have a good rapport with supervisors, did not relate well to "a lot of people," was not a "true team player," had been late submitting reports and other information, and had purchased supplies in an untimely manner. Mittendorf, Heady's boss, did have significant contact with Heady. He explained that Heady sometimes did not respond to requests in a timely manner. He also stated that Heady was sometimes difficult to approach because she was so quiet. Mittendorf was aware of Heady's FMLA leave, though he stated that this leave did not impact his evaluation of her performance.

The other two office managers in Heady's division were Lucille Hayes and Donette VanCleve. Heady scored lower than VanCleve on both functional and technical job competence,

and on job profile competence. Heady did, however, have ten years of employment with USEC while VanCleve only had five years of service. Both Heady and VanCleve had approximately the same education and training.

Upon determining that Heady was the lowest-rated of the three managers, USEC terminated her. On the day of Heady's termination, Heady had again requested additional FMLA leave.

Approximately one year after her termination, Heady applied for a secretarial position at USEC. USEC interviewed Heady but did not select her for the position. This decision was based, in part, on the recommendation of Powell. Heady applied for numerous other positions at USEC, but has provided no evidence that she was qualified for any of them.

In February 2001, Heady filed a complaint with the Department of Labor ("DOL") alleging that her termination violated the provisions of the FMLA. The DOL agreed, though its April 18, 2002 letter finding such a violation stated no basis upon which this conclusion was reached. USEC refused to accept the DOL's findings.

Heady then filed this action in federal district court alleging retaliation in violation of the FMLA. The district court granted summary judgment to USEC, finding that Heady failed to show that its reasons for termination, the reduction in workforce and Heady's evaluation for that purpose, were a pretext for unlawful discrimination. This appeal followed.

## II. ANALYSIS

### A. Standard of Review

This Court reviews a district court's grant of summary judgment *de novo*. *McKay v. Toyota Motor Mfg., USA, Inc.*, 110 F.3d 369, 372 (6th Cir. 1997). In reviewing a motion for summary

judgment, the court must view the facts in the light most favorable to the non-movant, drawing all reasonable inferences in his or her favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

**B. Heady failed to show that USEC's reason for her discharge was a pretext for unlawful discrimination.**

Heady claims that USEC discharged her in retaliation for her taking leave protected by the FMLA. To survive summary judgment, Heady must provide sufficient evidence to show that the exercise of her FMLA rights was a motivating factor in her discharge. *Gibson v. City of Louisville*, 336 F.3d 511, 514 (6th Cir. 2003).

In cases such as this one, where there is no direct evidence of retaliation, this Court applies the familiar *McDonnell Douglas* burden-shifting scheme, which requires that the plaintiff first make a prima facie case of retaliation. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001). To establish a prima facie case, Heady must show: (1) that she engaged in statutorily protected activity; (2) that she suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action. *Id.* at 314.

As for the first prong of the test, the FMLA requires employers to permit employees to take twelve weeks of unpaid leave for serious health conditions which impair the employee's ability to carry out his or her duties. 29 U.S.C. § 2612(a)(1)(D). Heady has carpal tunnel syndrome, and she

took leave for this condition in 1996. Heady also took FMLA leave in 1999 and 2000 for surgeries. She requested additional FMLA leave on the date of her discharge. Accordingly, Heady engaged in statutorily protected activity.

Heady also met the second prong of the test because she established that she suffered an adverse employment action. That adverse employment action was her discharge in July of 2000.

The district court found, as to the third prong, that Heady established there was a causal connection between Heady's exercise of her FMLA-protected rights and her discharge: Heady was discharged on the same day she requested additional FMLA leave. Proximity in time between a request for FMLA-protected leave and discharge may provide sufficient evidence of a causal connection for purposes of establishing a prima facie case of retaliation. *Skrjanc*, 272 F.3d at 314. Because "[a] plaintiff's burden in establishing a prima facie case is not meant to be an onerous one," the district court did not err in finding that the third prong was met. *Id.* at 315.

Once Heady established a prima facie case of retaliation, the burden shifted to the defendant to articulate a legitimate, non-discriminatory basis for Heady's termination. *Skrjanc*, 272 F.3d at 314. To meet this burden, USEC adduced evidence regarding its reduction-in-workforce plan and its determination that Heady was the lowest-rated employee of the three office managers. USEC supported its "honest belief" that Heady was the lowest-rated manager with particularized facts that were before it when the decision was made. *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998) (applying burden-shifting scheme in ADA case). The individuals who reviewed Heady conducted an evaluation that considered multiple competencies, explained their low ratings, and

gave specific reasons to support the low ratings. Accordingly, USEC set forth a legitimate, non-discriminatory reason for her discharge.

The burden next shifted back to Heady to show that USEC's reasons for discharging her were pretextual. *Skrjanc*, 272 F.3d at 314. Heady can establish that USEC's reasons for discharge were pretextual by showing that the reasons given have no basis in fact, did not motivate the discharge, or were insufficient to warrant discharge. *Wexler v. White's Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003). Heady may also meet her burden by showing that USEC's reasons for discharge were not credible. *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 470 (6th Cir. 2002). While temporal proximity is sufficient to meet the low burden required to establish a prima facie case of retaliation in violation of the FMLA, it is not alone sufficient to establish that an employer's legitimate, non-discriminatory reason for discharge was a pretext. *Skrjanc*, 272 F.3d at 317. Therefore, Heady must provide further evidence that creates a genuine issue of material fact regarding the truth of USEC's proferred reasons for her discharge.

Heady did not provide evidence to create a genuine issue of material fact as to whether USEC's reasons for her termination were a pretext for unlawful discrimination. First, Heady did not show that she was more qualified than the other two office managers. When asked about her performance in comparison to VanCleve, Heady stated "I felt like I was an adequate employee. In comparison, I didn't have the opportunity to observe her typing skills or things like that, she worked in another building and I worked in 31 building." Although Heady did note that she was more senior than VanCleve since she had worked at USEC for ten years and VanCleve had only worked at USEC for five years, this fact alone was insufficient to show that Heady was more qualified,

particularly since Heady had less seniority than VanCleve as an office manager. In addition, the reduction-in-workforce performance evaluations of VanCleve and Heady show that VanCleve received higher scores than Heady and that both have equivalent education and training. As for Hayes, who Mittendorf, Mack, and Powell ranked higher than Heady on the Candidate Selection Worksheet, it was Heady's burden to show that she was more qualified than Hayes. Heady failed to argue that she was more qualified than Hayes, nor has she produced any such evidence. Accordingly, Heady does not assert that she was more qualified than Hayes, and even if she did make such an assertion, no evidence supports it.

Rather than provide evidence that she was more qualified than either VanCleve or Hayes, Heady makes several arguments challenging the process by which USEC evaluated her. However, these arguments do nothing to show that USEC's reasons for her discharge were untrue.

First, Heady argues that the three evaluators could not "rationally" explain the ratings with any specific facts. Many of Heady's low ratings were in areas that involved interpersonal skills: approachability, composure, customer focus, interpersonal savvy, peer relationships, and teamwork/professionalism. Powell stated in her deposition that Heady did not have a good rapport with supervisors, did not relate well to "a lot of people," and was not a "true team player." Mittendorf stated that Heady was difficult to approach. These statements rationally explain the low ratings in customer and interpersonal skill categories. The other skill category in which Heady received a low rating was whether she was "action oriented." Powell described Heady's difficulties ordering supplies in a timely manner. Heady stated in her deposition that in response to this deficiency, Mittendorf told her she should be more proactive and aggressive in handling problems

of this sort. It is therefore clear that Heady had been informed that she needed to be more "action

oriented." Absent evidence to show that she had improved, USEC's evidence rationally supports

her low rating. Thus, USEC demonstrated a rational basis for the low ratings it gave to Heady.

Second, Heady argues that the reasons articulated by USEC are not rational from a business

perspective. However, USEC does not claim that Heady was unqualified for her position, only that

she was the lowest-rated office manager of the three who were evaluated. The reasons articulated

by USEC – failure to submit reports and purchase supplies in a timely manner, lack of rapport with

supervisors, inability to relate well to people – clearly support Heady's lower ratings. Accordingly,

these reasons justified Heady's termination in the context of an involuntary workforce reduction.


Third, Heady argues that USEC changed its workforce reduction policy prior to evaluating

individuals for discharge, which shows pretext. A close reading of the policy, however, does not

support this argument. All of the factors outlined in the USEC manual for use during an involuntary

reduction in workforce were incorporated into the evaluation sheet actually used during the

reduction. The USEC manual cited: (1) performance and demonstrated abilities; (2) relevant

education and training; (3) critical skills; (4) transferability of skills; and (5) length of service to the

company, as relevant factors for consideration during an involuntary workforce reduction. The

Candidate Selection Worksheet encompassed these factors; thus, USEC did not deviate from the

workforce reduction policy outlined in the manual.

Finally, Heady argues that her previous evaluations rebut the ratings USEC gave her in the

involuntary-reduction-in-workforce evaluation. Heady had received a rating of "effective

performance" in her evaluations for the preceding three years. While this evaluation was adequate for continued employment under ordinary circumstances, it was not USEC's highest rating of "exceeds expectations." Heady received similarly average ratings in the performance review used in the reduction in workforce. On a five-point scale, Heady received one "5" rating, seventeen "3" ratings, six "2" ratings, and one "1" rating, with "1" being the lowest. Thus the vast majority of her skills were rated "average," which is exactly how she was rated the previous three years at USEC. Therefore, Heady's previous evaluations do not rebut her reduction-in-workforce evaluation.

Heady also asks this Court to consider the DOL's finding that USEC violated the FMLA. It was within the discretion of the district court to consider an administrative finding in an employment discrimination case. *Heard v. Mueller Co.*, 464 F.2d 190, 194 (6th Cir. 1972). It is not clear what weight the district court gave the DOL determination. Nevertheless, the DOL's decision is of limited persuasive value because it provides no analysis or justification for its conclusion that Heady's discharge violated the FMLA.

### III. CONCLUSION

For the preceding reasons, we **AFFIRM** the district court's grant of summary judgment.