NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0634n.06

No. 08-3301

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

Sep 08, 2009

LEONARD GREEN, Clerk

CAROL PECK,

      Plaintiff-Appellant,

v.

ELYRIA FOUNDRY CO.,

      Defendant-Appellee.

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE NORTHERN
DISTRICT OF OHIO

_____/

Before:     MARTIN, SUHRHEINRICH, and WHITE; Circuit Judges.

     BOYCE F. MARTIN, JR., Circuit Judge. Carol Peck claims that Elyria Foundry Company refused to hire her because she is a woman. The district court concluded that her evidence was too weak to support a Title VII sex discrimination claim and entered summary judgment in Elyria's favor and Peck appeals. We hold that Elyria's contradictory explanations for not hiring Peck, combined with evidence that Elyria treated her application differently from men's applications, could permit a jury to reasonably infer that Elyria was covering up a sexually discriminatory hiring decision. We therefore REVERSE and REMAND Peck's discrimination claim to the district court.

I.

     In June 2004, Carol Peck and her boyfriend, Brian Wolters, both filled out job applications for Elyria Foundry Company. Peck, who had worked in other foundries, listed "Grinder,"

"To[w]motor," and "?" as the "position sought" on her application.[1] Wolters, who had no foundry experience, wrote on his application that he was seeking work in "anything."

Roughly two weeks later, Elyria hired Wolters to work in its melt shop. Peck then phoned the company two or three times a week about the status of her application, but never heard back. About a month and a half after applying, she spoke to Elyria's human resources director, Denise Sprague, in Elyria's parking lot (Peck was waiting to pick up Wolters from work). Peck says that Sprague told her that her application was still on her desk and that Sprague would call in a couple of days.

In late July (after the parking lot conversation between Sprague and Peck), Peck's attorney sent Elyria's president a letter alleging that "the company chose not to hire [Peck] because of a stereotypical decision that women cannot work in the plant." It closed with a warning: "If I do not hear from you or your representative within two weeks, I will file a charge of discrimination." Peck did not hear from Elyria, and so filed an employment discrimination charge against the company with the Equal Employment Opportunity Commission. After receiving a right-to-sue letter, Peck sued Elyria alleging, without further specificity, violations of Title VII, 42 U.S.C. § 2000e et seq., and the Ohio Civil Rights Law. She asked the district court to order Elyria to hire her, and pay full back-pay and benefits, and to award punitive damages. Peck later sought leave to amend her complaint to add a state tort claim for refusal to hire based on her decision to contact an attorney.

The district court refused Peck's request to amend her complaint and granted Elyria's motion for summary judgment on Peck's discrimination claims. *Peck v. Elyria Foundry Co.*, 533 F. Supp.

---

[1]The parties use the terms "grinder" and "chipper and grinder" to describe a single position.

No. 08-3301
*Carol Peck v. Elyria Foundry Co.*
Page 3

2d 759, 762 (N.D. Ohio 2008). Peck appeals.

## II.

We review the district court's grant of summary judgment de novo. *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 523 (6th Cir.2007). Summary judgment should be granted only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. Civ. P. 56(c). When we review a motion for summary judgment, we must view all facts and inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.

We analyze Title VII claims based on circumstantial evidence under the ubiquitous burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), and later modified in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). Under this framework, a plaintiff must first establish a prima facie case of discrimination. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). This creates a presumption that the defendant discriminated against her in violation of Title VII. *Id.* at 414 (citing *Burdine*, 450 U.S. at 254). To avoid summary judgment, then, the defendant must then put forth a "legitimate, nondiscriminatory reason" for the complained of adverse treatment. *Id.* (citing *Burdine*, 450 U.S. at 253). This explanation "must be legally sufficient to justify a judgment for the defendant." *Burdine*, 450 U.S. at 255. If the defendant meets this burden, the presumption of discrimination created by the prima facie case falls away, *id.* at 255, and the plaintiff must show that the defendant's "'legitimate

nondiscriminatory reason'" was merely a "'pretext for discrimination.'" *DiCarlo*, 358 F.3d at 414-15 (quoting *Burdine*, 450 U.S. at 253). The plaintiff bears the ultimate burden of proving, by a preponderance of the evidence, the employer's intent to discriminate. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

## A.

A prima facie case of sex discrimination, based on Elyria's failure to hire Peck requires her to demonstrate that men who applied to Elyria were hired instead of her, even though she was as qualified for the open positions. *See McDonnell Douglas*, 411 U.S. at 802; *Birch v. Cuyahoga County Probate Court*, 392 F.3d 151, 166 n.12 (6th Cir. 2004).

We begin by highlighting our disagreement with the district court's, Elyria's, and the dissent's characterization of what positions Peck applied for at the foundry. The district court concluded that Elyria "reasonably assumed Ms. Peck sought a position as *either* a 'Chipper and Grinder' or as a 'Tow Motor Operator,'" *Peck*, 533 F. Supp. 2d at 759 n.1 (emphasis added). And, on appeal, Elyria attacks Peck's claim with respect to those two positions. Had Peck only applied to those two jobs, we might have no quarrel with the district court's conclusion that Elyria had legitimate nondiscriminatory (and unrebutted) reasons for not hiring her as a grinder or tow motor operator: its good faith belief that she had a medical condition that would prevent her from working as a grinder, and the absence of a tow motor operator opening.

But the conclusion that Peck applied for just two jobs at the foundry is not reasonable in light of her application as it ignores the "?" that Peck wrote; Peck's application gave Elyria ample notice that she was interested in foundry work other than just those two positions: See for yourself:

Indeed, Peck also wrote "?" under salary, and no one would think that the "?" in that spot indicated

that she wanted to work for free. We thus conclude that a jury could find that Elyria had reasonable

notice that Peck wanted to be considered for positions besides tow motor operator or grinder.[2] *Cf.*

*Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000) ("The court first determines

if a plaintiff has put forth sufficient evidence for a reasonably jury to find her to have met the prima

facie requirements[.]").

---

[2] The dissent finds our reading of Peck's application "sheer speculation" because a "question mark" is, according to one definition in *Webster's*, "something unknown, unknowable, or uncertain." First, we observe that the "?" is separated from "tomotor" with a hyphen, which would indicate that it was intended as a third alternative. Second, we do not speculate; rather, as we must at the summary judgment stage, we resolve all reasonable inferences in Peck's favor. The dissent's alternative theory merely reinforces the existence of a "genuine issue of material fact" as to whether Peck applied for other positions. *See Dew v. A.B. Dick Co.*, 231 F.3d 1016, 1022-23 (6th Cir. 2000) (quoting *Hicks*, 509 U.S. at 509-10) ("If . . . reasonable minds could *differ* as to whether a preponderance of the evidence establishes the facts of a [Title VII] prima face case, then a question of fact *does* remain, which the trier of fact will be called upon to answer.").

Next, we examine whether Peck was qualified for positions at the foundry. "At the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job." *Wexler v. White's Fine Furniture*, *Inc.*, 317 F.3d 564, 575 (6th Cir. 2003) (en banc). This burden can be met by presenting "credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria" in the field. *Id.* at 576. The inquiry focuses on "education, experience in the relevant industry, and demonstrated possession of the required general skills." *Id.*

Peck detailed five years of various foundry work, including as a tow motor operator, machine operator, packer and inspector, and chipper and grinder on her application. Her application shows at least as much, if not more, experience than many of the approximately fourteen men that Elyria hired for non-grinder positions between the time that Peck applied and the day her attorney sent the letter threatening to file the discrimination charge. During that time, Elyria hired men to various jobs including as a yard worker, shake out employee, inspector, and core finisher. Many of the men hired did not list any foundry experience, or experience in the positions for which they were hired. For example, Elyria hired J.J., who listed experience as a car dealership porter and a customer service representative, for yard work. It hired E.C., with experience as a truck unloader, material handler, and machine operator, to work as an inspector. And, in her deposition, Sprague denied that from the face of Peck's application she was unqualified for foundry work. Thus, based on Peck's resume and application, and her experience compared to the men that Elyria hired instead of her, we conclude that she has met the "not onerous" burden of establishing a prima facie case of sex discrimination. *See Burdine*, 450 U.S. 248, 254-55 (1981).

B.

Because Peck established her prima facie case of sex discrimination, the burden of production shifts to Elyria to produce evidence that it did not hire Peck because of a legitimate, nondiscriminatory reason. *See id.* at 255-56.

The district court (and now the dissent) concluded that Elyria "reasonably assumed" that Peck was only interested in working as a grinder or tow motor operator, and so it did not consider Elyria's explanations for why it did not hire Peck for positions other than those two. We thus review Elyria's nondiscriminatory reasons which, if credited, could explain why it did not hire Peck for any of the positions it filled after she applied. *See Hicks*, 509 U.S. at 522 ("[T]he defendant's 'articulated reasons' themselves are to be found 'lurking in the record.'").

Elyria offered several reasons for its decision, all based on statements or testimony from Denise Sprague, its director of human resources. At one point, Sprague explained that she never called Peck for an interview because she thought Peck was only looking for work as a grinder or a tow motor operator. But later, in the same deposition, her testimony suggested that she would have considered Peck for other available positions but for the fact that the company was working on improving Elyria's women's facilities:

> Q:   But in your case, you limited her to the jobs that you felt that she was—wanted to do, just grinder and tow motor operator?
> A:   No. That's not true.

\* \* \*

> Q: Why wouldn't you consider her for anything else, other than grinder and tow motor operator?
>
> A: I needed to get proper facilities for the women, and it was set aside on my desk.
>
> * * *
>
> Q: So the reason you never considered her for any other position is because you felt they didn't have facilities?
>
> A: At that time, correct. And we were working on [getting proper women's facilities] during that summer and then—.

For the first time on appeal, Elyria relies on this testimony as a nondiscriminatory reason for not hiring Peck, including this as one of its headings: "Elyria Foundry Needed to Attend to the Women's Facilities Before It Could Give Further Attention to Peck's Application." Standing alone, delaying consideration of Peck's application due to the lack of women's facilities does not strike us as a particularly weighty "nondiscriminatory" reason for passing on an applicant.[3] But Sprague gave other reasons too, including reliance on a report from a former coworker that Peck did not have reliable transportation and childcare. She also explained that, though Peck's application remained under consideration, she took "no further steps" toward hiring Peck after the company received a letter from her attorney that the company argues was "laced in insults and lies."[4] If considered

---

[3]    *See, e.g., Wedow v. City of Kansas City, Mo.*, 442 F.3d 661 (8th Cir. 2006) (city employer's failure to provide adequate facilities constituted "adverse employment action" for Title VII). But Peck did not indicate that she was challenging Elyria's conduct under 42 USC § 2000e-2(a)(2), which outlaws an employer's decision to "limit, segregate, or classify" job applicants based on sex, nor did the parties brief that issue.

[4]    Although the decision to remove a candidate from consideration after being accused of sex discrimination might amount to impermissible retaliation under Title VII, Peck did not plead a retaliation claim and has never attempted to argue that Elyria's response to her attorney's letter was retaliatory. Thus, here, we credit the impulse, as the district court put it, "not to hire a lawsuit," among the nondiscriminatory reasons articulated by Elyria.

individually, these reasons *could* permit the conclusion that Elyria had nondiscriminatory reasons for not hiring Peck for any position at the foundry. Thus Elyria met its burden of rebutting Peck's prima facie case by stating reasons that, on their face and individually, would be neutral reasons for not hiring Peck. *See Hicks*, 509 U.S. at 509.C.

Once Elyria met its burden of production, the court's task, at the summary judgment stage, was to determine whether there was a legally sufficient basis for a reasonable jury to find that Elyria's reasons were pretextual and that Elyria intentionally discriminated against Peck because of her sex. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000). A question of fact remains if a jury could reasonably conclude based on the evidence that Elyria's "legitimate reasons . . . were not its true reasons, but were a pretext for discrimination." *Id.* at 143 (quotations omitted). In other words, the question is whether the employer's stated reason were its true reasons, or were, instead, phony ones offered later to cover up discrimination. In assessing pretext, a jury is free to consider the evidence establishing Peck's prima facie case, and "inferences properly drawn therefrom." *Id.* A jury's "disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." *Hicks*, 509 U.S. at 511. Thus, if a jury could reasonably reject Elyria's proffered reasons, it would be permitted to "infer the ultimate fact of intentional discrimination." *Id.*

Employers may have more than one reason for passing on a job candidate. And considered individually, any of Elyria's reasons for not hiring Peck *could* explain its hiring decision. The problem here, however, is that some of its reasons are inconsistent at best, if not outright

contradictory, and are thus "so intertwined" that the credibility of any of them is in doubt. *Cf. Smith v. Chrysler Corp.*, 155 F.3d 799, 809 (6th Cir. 1998). Moreover, "an employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002);[5] *Simple v. Walgreen Co.*, 511 F.3d 668, 671 (7th Cir. 2007) (an inconsistency is "suggestive of pretext"); *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2002) (holding that when a company "at different times, gives different explanations, a jury may infer that the articulated reasons are pretextual.").

Here, it would be a logical feat for a jury to believe both Sprague's testimony that she did not hire Peck because she thought Peck did not apply for more than two positions *and* that she did consider her more broadly, yet passed because she received damning input from a former coworker, and because the women's bathrooms were not up to par. A contradiction by the *same* employee in the *same* deposition raises serious credibility concerns; either Sprague considered Peck for more than two positions or she did not.[6]

---

[5] The dissent finds *Cicero* "inapposite" because, in its view, "Sprague repeatedly and consistently testified that she *was* considering Peck for other jobs." To the contrary: Sprague's affidavit states that she "reviewed the application and determined that Ms. Peck was seeking a job as either a Tow Motor Operator or a Grinder." Elyria's interrogatory responses, which Sprague verified, state only that the "Company still held the application in the event that a tow motor position might become available" and Elyria's motion for summary judgment did not take the position that Peck was considered for other jobs.

[6] Despite its view that Sprague "repeatedly and consistently" stated that Peck was considered for other jobs, the dissent nevertheless invokes the "honest belief rule" and finds that "Elyria had an honest and reasoned belief that Peck was applying for two specific positions because those were what Peck clearly listed on her application." The simultaneous application of the "honest belief rule" and protestation that Peck *was* considered for other positions only highlights the confusing and inconsistent testimony in the record and further emphasizes the presence of a genuine issue of material fact.

There are other weaknesses in Elyria's explanations as well. Why, for example, would Peck's application "remain[] active" until Peck's attorney sent the letter if, as the company maintains, it "should not feel compelled to interview a candidate who . . . has a history of poor attendance at a former place of employment"? A poor attendance record is a legitimate nondiscriminatory reason to exclude an applicant for consideration for any position. But if a report of Peck's attendance issues dissuaded Elyria from hiring Peck, it does not follow that Elyria would have had any reason to keep Peck's application under consideration.

Setting these inconsistencies aside, other evidence undermines the credibility of Elyria's explanation. Peck submits evidence that, at least sometimes, Elyria hired men for positions that differed from what they specified on their applications. Yet, as we explain above, Sprague testified (at one point in her deposition) that the reason she never phoned Peck for an interview was "because her application was based on chipping and grinding." Why would Sprague limit her consideration of Peck's application to two positions (ignoring altogether the "?" on her application) when she apparently did not make such assumptions of male applicants? *Cf. Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994) (describing insufficiency of explanation as a method of attacking credibility).

Our conclusion that these inconsistencies suggest pretext does not mean that a company is precluded from pursuing alternative lines of defense to convince a jury that its decision was not motivated by sex discrimination. But at the summary judgment stage, a plaintiff may meet her burden of demonstrating pretext by showing, in addition to proffered evidence, that an employer's reasons are so incoherent, weak, inconsistent, or contradictory that a rational jury could conclude the

reasons were not believable. *See, e.g. Cicero*, 280 F.3d at 592 (observing that a conflict "raises an issue whether the proffered reason truly motivated the defendant's decision.") (quoting *Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1167 (6th Cir. 1996); *Tuttle v. Metro. Gov. of Nashville*, 474 F.3d 307, 319-20 (6th Cir. 2007); *cf. Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005); *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004).[7]

We consider these inconsistencies and implausibilities in addition to Peck's circumstantial evidence of discrimination. *See Reeves*, 530 U.S. at 143. There is no evidence in the record that any of the men Elyria hired instead of Peck were more qualified than she, who had worked in various foundry positions. In fact, Peck listed experience as a foundry inspector on her resume, while E.C., a man Elyria hired to the position instead listed no foundry experience at all, let alone as an inspector. And Elyria's argument that Peck was not "similarly-situated" to male applicants for non-grinder positions is a non-starter: Elyria has pointed to no evidence that the medical condition that it purportedly believed disqualified Peck as a grinder would have prevented her from holding other positions at the foundry.[8]

---

[7] Elyria's contention that the letter from her attorney ruined her chances at employment does not explain why Sprague did not call Peck for an interview during the eight weeks between when she applied and when Elyria received the letter. The evidence shows that Elyria hired at least twenty-two men for various positions during that time period, some within days of their application and several without any foundry experience.

[8] Of course Peck bears the burden of showing that Elyria's reasons were pretextual. We simply observe here that Elyria's passing speculation that "it is quite possible that Peck's physical limitation would have prevented her from holding any of these other positions," lacks any supporting evidence and does not distinguish Peck's qualifications from male applicants with respect to non-grinder positions.

Elyria may be able to reconcile some of the seemingly contradictory aspects of its explanation or it may be able to explain away apparent differences between how it treated Peck and the men it hired instead of her; indeed, the trial may cast the facts in a different light. But at the summary judgment stage, we must view the record "taken as a whole" and disregard evidence favorable to Elyria "that the jury is not required to believe." *Reeves*, 530 U.S. at 150 (internal citation omitted). On this record, the combination of Elyria's inconsistent reasons and evidence that Elyria hired men who lacked foundry experience instead of Peck could lead a reasonable jury to infer sex discrimination. Thus, the case cannot be resolved on summary judgment.

IV.

Finally, we can quickly dispense with Peck's argument that the district court erred by refusing to allow her to amend her complaint to set forth a public policy tort of refusal to hire. She acknowledges that "Ohio courts have yet to recognize the public policy tort of failure to hire," but urges this Court should apply the tort where "a Plaintiff is not hired in whole or in part because she contacted an attorney." In the absence of controlling state precedent, we must determine whether Ohio courts extend its public policy exception to employment-at-will to a situation involving a person who is seeking employment.

The Ohio Supreme Court recognizes a public policy exception to employment-at-will "when an employee is discharged or disciplined for a reason which is prohibited by statute." *Greely v. Miami Valley Maint. Contractors, Inc.*, 551 N.E.2d 981, 986 (Ohio 1990). The exception also applies when "dismissing employees" would "jeopardize" a public policy that is "manifested in a state or federal constitution, statute, or administrative regulation, or in the common law." *Collins*

*v. Rizkana,* 652 N.E.2d 653, 657 (Ohio 1995).  But Peck directs us to no case suggesting that Ohio would extend the tort to a failure to hire case.  Thus, we follow federal district courts within the Circuit which have concluded that a "review of Ohio law finds no case extending the public policy tort to claims involving a wrongful failure to hire or retaliation."  *Bools v. Gen. Elec. Co.*, 70 F. Supp. 2d 829, 832 (S.D. Ohio 1999).

## V.

For the reasons described above, we AFFIRM the district court's denial of Peck's motion for leave to amend her complaint.  We REVERSE and REMAND its grant of summary judgment in Elyria's favor on her sex discrimination claims.

**SUHRHEINRICH, Circuit Judge, concurring in part and dissenting in part.** I agree that the district court properly denied Peck's motion for leave to amend her complaint to include a public policy tort of refusal to hire. I further agree that Peck has made a prima facie showing that Elyria's failure to hire her was motivated by Peck's gender. However, Elyria has proffered legitimate, nondiscriminatory reasons for its decision not to hire Peck, and Peck has failed to demonstrate that those reasons were pretextual. Accordingly, I would affirm the district court's order granting summary judgment on Peck's Title VII claim.

## I.

The majority holds that summary judgment is inappropriate in this case because Elyria's contradictory explanations for refusing to hire Peck were indicative of pretext and because Peck's job application was treated differently from men's job applications. Both reasons are problematic.

As to the issue of whether Elyria offered conflicting reasons for not hiring Peck, Elyria offered five reasons for choosing not to immediately hire Peck. *First*, Denise Sprague, Elyria's director of human resources, did not consider Peck for the grinder position because Sprague believed, based upon Supervisor Greg Ganig's account of Peck's prior work performance at another foundry, that Peck had the beginnings of carpal tunnel syndrome. *Second*, Sprague also did not consider Peck for the grinding position based upon Ganig's explanation that Peck had "trouble getting to work because of . . . [h]er car [and] her children." (JA 194.) *Third*, Sprague did not immediately consider Peck for the tow motor position because it was already filled. *Fourth*, Sprague continued to consider Peck's application for other suitable openings but chose to defer any further action on Peck's application until Elyria could complete a renovation of women's facilities in the

foundry. And *fifth*, while Sprague was holding Peck's application for consideration once a suitable position opened and the bathrooms were renovated, she took no further action on Peck's employment application after receiving a letter from Peck's attorney threatening to sue for gender and racial discrimination.

To survive summary judgment, Peck had to show that Elyria's proffered reasons were pretextual. Peck can demonstrate pretext by showing that Elyria's proffered reasons: (1) have no basis in fact; (2) did not actually motivate the refusal to hire; or (3) are insufficient to explain the refusal to hire. *See Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2001).

Here, neither party disputes that there were no open tow motor positions when Peck applied, so any argument that Elyria failed to hire Peck for the *tow motor* position is a nonstarter. Peck also fails to demonstrate, under any of the three methods cited above, *see Dews*, 231 F.3d at 1021, that Elyria's reasons for refusing to consider her for a *grinder* position were pretextual. As to the first method of demonstrating pretext, Elyria's decision to reject Peck for the grinder position because of Peck's medical problems has a basis in fact. Peck does not dispute that she was removed from a previous grinding job because of medical debilitations in her arms. Similarly, Peck concedes that she briefly encountered problems with transportation and childcare while employed at General Castings, which was another reason that Elyria chose to defer consideration of Peck's application.

As to the second method, even though Peck had previous foundry experience, she was removed from a grinding position because of medical problems. Elyria was aware of these facts when it chose to reject Peck for the position, and the fact that Peck was removed from that same position by a former employer because of medical issues was a reasonable motivation for Elyria to

reject Peck for grinding. And regarding the third method, Peck fails to demonstrate that her previous medical problems and removal from a grinding position were insufficient reasons for rejecting her for the position. Peck acknowledges that she had suffered debilitations in her arms that spurred her removal from a grinding position. In sum, Peck has failed to demonstrate that Elyria's decision to reject her for a tow motor or grinding position was driven by a discriminatory motive.

However, the inquiry does not end there because Elyria also proffered that it was *continuing* to consider Ms. Peck for other positions–at least as a tow motor operator (*see* JA 66)–but that Elyria put Peck's application aside temporarily because it was in the process of updating its women's bathroom and locker room facilities. Peck's argument rebutting Elyria's "women's facilities" reason is as follows: Peck argues that because Title VII was enacted decades ago, Elyria's failure to have adequate facilities is illegal, and Elyria "should not be able to stand behind a decision based on a 'justification' which is in violation of the law." (App Br 15.)

Again, Peck fails under any of the three methods to demonstrate pretext. First, Peck's attempt to cast doubt on Elyria's "women's facilities" reason overlooks the undisputed fact that Elyria was in the beginning process of renovating its women's facilities around the time of Peck's application. Accordingly, the reason has a "basis in fact." Indeed, Elyria's plans to update its facilities actually support its claim that it intended to hire women. *See, e.g., Bruno v. City of Crown Point, Indiana*, 950 F.2d 355, 362 n.6 (7th Cir 1991) (noting that an employer currently constructing new women's restrooms "[i]f anything, . . . was evidence that the department anticipated hiring women.").

Regarding the second method, Elyria has never wavered from its position that it was choosing to wait on Peck's application, in part, until it had adequate bathroom facilities for women. As it was already in the process of renovating those facilities, it was not unreasonable for Elyria to delay further consideration of Peck's application until the deficiencies in its facilities were fixed.

And as to the third method, Peck fails to show that waiting for the bathrooms to be finished is insufficient to explain the delay in contacting her for an available position. According to Elyria, women had inadequate locker room, shower, and bathroom facilities, requiring female employees to use the bathroom on one floor and wash their hands on another floor. (JA 215.) Further, neither party disputes that Elyria was in the early stages of renovating the women's facilities to address these issues during the summer that Peck submitted her application. And Elyria explains that it was holding Peck's application for consideration once the bathrooms were completed. Therefore, it was not because of Peck's gender that Elyria failed to consider her, but because Elyria was devoting its resources to ensuring that women would have proper facilities to use before asking Peck for an interview. Elyria's decision to wait on Peck's application until the renovations were completed sufficiently explains why Peck was not immediately contacted for an interview. Therefore, Peck has failed to satisfy any of the three methods for demonstrating that Elyria's decision to hold Peck's application until the facilities were renovated is pretextual.

The majority finds Sprague's initial hesitation to interview Peck for a grinding position irreconcilable with Sprague's further explanation that she was continuing to consider Peck for other suitable positions. According to the majority, Sprague had received "damning input" from a former coworker, Greg Ganig, about Peck, which was reason enough to discontinue consideration of Peck's

application. If the attendance issues Ganig mentioned had dissuaded Elyria from considering Peck for the grinding position, the majority concludes that the fact that Elyria *continued* to consider Peck in the face of Ganig's comments raises credibility concerns about Sprague. The "damning input" to which the majority refers can be found in the depositions of Sprague and Ganig, who both testified that Ganig actually thought Peck was "a good worker" who had problems with her arms and had trouble getting to work because of problems with her car and childcare. (*See* JA 192; Sprague Dep 97-98.)

In *Smith v. Chrysler Corp.*, 155 F.3d 799 (6th Cir.1998), this Court acknowledged that "[t]here may be cases in which the multiple grounds offered by the defendant for the adverse action of which the plaintiff complains are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment." *Smith*, 155 F.3d at 809 (internal quotation marks and citation omitted). The *Smith* Court also explained that it is up to the plaintiff to "demonstrate that the employer's reasons (*each of them*, if the reasons independently caused [the] employer to take the action it did) are not true." *Id.* at 806 (internal quotation marks and citation omitted). In *Smith*, though the plaintiff offered evidence rebutting one of employer's two proffered nondiscriminatory reasons, the Court held that casting doubt on one of the reasons did not cast doubt on the other because the "two justifications and the sources from which they were derived were separate in nature." *Id.* at 809.

Here, the nondiscriminatory reasons Elyria gave are "separate in nature." Even if Sprague was concerned about Peck's temporary attendance issues at her previous job, that concern does not preclude Sprague from revisiting Peck's application once a suitable position opened and then

inquiring whether Peck had solved the transportation and childcare problems. Indeed, Peck goes to great lengths to show that Elyria hires employees with, in Peck's opinion, less than sterling employment histories. (*See, e.g.*, App Br 23-26.) Sprague similarly continued to consider Peck even though Ganig mentioned that Peck had attendance problems–which Peck herself argues were temporary and easily remedied–at her prior job. (*See* App Br 19.) Therefore, it was perfectly logical for Sprague to hold Peck's application until suitable positions opened. Had Sprague stopped considering Peck after Ganig explained that she had transportation and childcare problems, the majority presumably would find no inconsistency and, thus, no pretext. To the majority, the fact that Elyria has consistently maintained that it was keeping Peck's application active for suitable openings, despite Ganig's opinion, is illustrative of pretext. However, Elyria's decision not to immediately consider Peck for a grinding position based, in part, on her temporary transportation and childcare issues while at her previous job is not so "fishy and suspicious" as to cast doubt on Elyria's decision to consider Peck for other positions in the future. The main reason Elyria has proffered for rejecting Peck for the grinding position has always been that Elyria believed Peck had the beginnings of carpal tunnel.

More to the point, Elyria consistently maintained that it was continuing to consider Peck until a tow motor position opened and Elyria had renovated the women's facilities. Neither of those events occurred before Peck's attorney sent the letter, which Sprague believed was the beginning of legal action (*see* JA 52) and prompted Elyria to cease further action on Peck's application. Therefore, it is impossible to infer those reasons given were pretextual given the record as developed.

Further, Peck never argues in her brief to this Court that Sprague's proffered reasons were inconsistent or irreconcilable. In fact, in her own affidavit and brief, Peck corroborates Sprague's explanation that Elyria was still considering Peck for employment until Peck's attorney threatened legal action. (*See* JA 115; App Br 19-20, 26-27.) Also undisputed, Sprague herself inquired of Peck's former supervisor about Peck's suitability for work at Elyria. And it was Sprague, who noticed Peck in Elyria's parking lot waiting to pick up another employee, who proactively approached Peck to let her know that she was still being considered for a position and would be contacted after Sprague got "a few things in order," (JA 231), referring to the women's facilities (*id*.). Logically, Sprague would not have taken any of these actions had she not been considering Peck for employment. Sprague's actions, combined with undisputed testimony that Elyria was renovating the women's facilities in anticipation of hiring more females, show that Peck was still being considered for employment, and that Elyria ceased further consideration of Peck's application not because she was female but because Peck's attorney sent the letter threatening legal action.

The majority cites *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002), for the proposition that an employer's changing rationale for making an adverse employment decision can be evidence of pretext. *Cicero* is inapposite here. In *Cicero*, the employer provided one reason in interrogatories, another in a deposition, and yet another at the summary judgment stage for its decision to discharge the plaintiff. *Id.* No such inconsistency occurred here. As quoted above, Sprague's testimony that she did not immediately consider Peck for grinder or tow motor but chose to "set aside" Peck's application for further consideration once the women's facilities were

completed and a suitable position opened is unrebutted and unchanging through Sprague's deposition, Elyria's responses to Peck's interrogatories, and at the summary judgment stage.

In sum, Peck has not called into doubt any of the five reasons given for deferring action on her job application. As such, Peck has failed in her burden of showing that Elyria's proffered reasons for not hiring her were masking any discriminatory animus. And her claim must, as the district court properly held, fail.

**II.**

The majority also holds that Elyria treated Peck's employment application differently than men's applications. The majority explains that, at least sometimes, Elyria hired men for positions that differed from what they specified in their job applications and, therefore, Elyria's decision to consider Peck only for employment as a grinder or tow motor operator may be indicative of gender discrimination.

As the majority finds, Peck listed "Grinder - Tomotor - ?" on her application in the field titled "Position Sought." Elyria explains that it believed Peck was seeking a position as either Grinder or Tow Motor. The majority, however, infers that the "?" implies that Peck also "wanted to be considered for positions besides tow motor operator or grinder."

The majority holds that the question mark meant that Peck was seeking consideration for *other* positions besides grinder and tow motor and supports its conclusion by referencing another question mark Peck placed in the "Expected Monthly Salary or Hourly Wage" field. The majority reasons that because Peck added a "?" under salary, and no one expects that the question mark there would mean she would work for free, then somehow a question mark after "Tomotor" indicates that

she wanted to be considered for jobs other than those listed. In essence, the majority takes a punctuation symbol, and turns it into a "fact," i.e., that Peck intended to apply for other positions, and because Peck had that intent, Elyria showed discriminatory animus by not reading the application that way. However, the question mark is not a "fact," let alone one that creates "a genuine issue of material fact" of gender discrimination or pretext. *See* Fed. R. Civ. P. 56(c). The question mark can mean any number of things; indeed, one dictionary definition of "question mark" is "something unknown, unknowable, or uncertain." *Webster's Ninth New Collegiate Dictionary* 966 (1988). Thus, any interpretation we may have is sheer speculation in the absence of any other relevant proof. The burden of bringing forth that "other relevant proof" is on Peck to show that Elyria understood what Peck meant by the question mark and ignored her desire to be considered for "any position" because she is a woman. Peck has not done so here.

Instead, Peck's complaint supports the district court's view that Peck applied only to work as a grinder or tow motor operator. In her complaint, Peck avers that she "applied for various positions with Defendant on or about May 25, 2004," (JA 8), but nowhere in her complaint does she allege that she was applying for any positions other than those listed. Indeed, as she further explains in the same paragraph of her complaint, "Despite the fact that Plaintiff was qualified for *these* positions with Defendant having over five years experience in various capacities in the industry, the Defendant failed to hire her, but instead hired numerous males who were far less qualified." (*Id.* (emphasis added).) Peck's language–that she was qualified for "these" positions–indicates that she was applying for specific positions, namely the two listed on her job application, because she obviously cannot claim to be qualified for a "?" position. Therefore, it was reasonable for the district

court and Elyria to believe that Peck was applying for the two positions she listed on her job application–grinder and tow motor operator.

Even if the district court and Elyria misinterpreted this confusing "?" on Peck's job application, proving that Elyria failed to clue in to Peck's desired employment does not prove pretext. The fact remains that Elyria had an honest and reasoned belief that Peck was applying for two specific positions because those were what Peck clearly listed on the application. And under this Court's articulation of the "honest belief rule," "for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, 'the employer must be able to establish its reasonable reliance on the particularized facts before it at the time the decision was made.'" *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006) (quoting *Smith v. Chrysler Corp.*, 155 F.3d at 806). This Court does not "micro-manage the process used by employers in making employment decisions," nor does it require "that the decisional process used by the employer be optimal or that it left no stone unturned." *Smith*, 155 F.3d at 807. Instead, our inquiry is whether Elyria "made a reasonably informed and considered decision before taking an adverse employment action." *See id*. Here, regardless of Peck's intentions behind adding the question mark, Peck only included two words, the second of which was misspelled, on her application for positions sought. It was thus reasonable for Elyria to conclude that those were the two jobs for which Peck was applying. Peck has failed to develop the record to support the majority's conclusion that Elyria should have considered Peck for any and all jobs it had available.

Further, Peck has not presented evidence that she qualified for the few positions that Elyria filled with applicants who did not apply for them. And choosing to *wait* on Peck's application until

Elyria could finish renovating the bathroom for its female employees is an unrebutted and legitimate reason for deferring on Peck's application for *any* open positions. It does not follow that Elyria failed to consider Peck for "other" positions, i.e., treated Peck's application differently, solely because Elyria chose to hold Peck's application until Elyria believed that a suitable position was available.

In reaching its holding, the majority reasons, *inter alia*, that "Elyria has pointed to no evidence that the medical condition that it purportedly believed disqualified Peck as a grinder would have prevented her from holding other positions at the foundry." However, the majority misapplies the law in this Circuit by requiring Elyria to provide "evidence that the medical condition that it purportedly believed disqualified Peck as a grinder would have prevented her from holding other positions at the foundry." This Court has consistently held that once an employer articulates a legitimate reason for taking its employment decision, the burden is on the applicant, not the putative employer, to demonstrate that the proffered reason for failing to consider the applicant was pretextual. *See, e.g., Abdelnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 502 (2007) (holding that once the defendant has set forth a "legitimate non-discriminatory reason" for the adverse employment decision, the burden shifts to the plaintiff "'to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination'") (quoting *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004)). Contrary to the majority's reasoning, it was not for Elyria to offer a legitimate reason and then prove that it was not pretextual. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)

("The defendant need not persuade the court that it was actually motivated by the proffered reasons" in order to fulfill its burden under the second step of the *McDonnell Douglas* framework.).

In the end, the question of whether Peck meant to apply for two jobs or any open job is irrelevant because Denise Sprague repeatedly and consistently testified that she *was* considering Peck for other jobs, but that Peck's medical issues, the lack of available restroom facilities, and the lack of job openings prevented Peck's immediate hire. For example, when Peck's attorney asked why Sprague never called Peck for an interview, Sprague testified that she did not immediately call Peck because "[h]er application was based on chipping and grinding," and because Sprague believed "she had the beginnings of carpal tunnel." (JA 211.) Peck's attorney then asked why Sprague considered Peck for those two positions only. Sprague replied that she did not limit her consideration to those two positions:

Q. But in your case, you limited her to the jobs that you felt that she was – wanted to do, just grinder and tow motor operator?
A. *No. That's not true*.

(JA 213 (emphasis added).) Peck's attorney pressed the issue:

Q. I asked the question – the question that I asked you was, did you consider her for any other job, other than grinder and tow motor?
A. *Her application was set aside*, and until there were proper women's facilities – *it was not that I did not consider her for any other position*; *it was set aside*.

(JA 214 (emphasis added).) Peck's attorney asked the question again, and Sprague replied with the same answer that she was still considering Peck for other positions, but set aside her application until the women's facilities were completed:

Q. Why wouldn't you consider her for anything else, other than grinder and tow motor?
A. I needed to get proper facilities for the women, and it was set aside on my desk.

(JA 214.)

In other exchanges on the issue in the same deposition, Sprague explained that she was still considering Peck for other positions, but her application was set aside until the women's facilities were completed, she did not believe she had other suitable openings, and because Peck may have had carpal tunnel:

Q.      Showing you what has been marked as Plaintiff's Exhibit 15, just to go back before we get into that. And you didn't consider her for any other jobs like yard work or anything like that?
A.      Not at the time. I don't believe I had any openings. And when she had the carpal tunnel and I didn't have the women's facility, I was putting it on the side.

(JA 222.)

Q.      Why didn't you ever interview my client for core finishing jobs?
A.      I set it aside after I found out from Gary that there was potential that she had carpal tunnel. And I also set it aside to get the locker facilities fixed. And when I got the letter [threatening legal action], I stopped.

(JA 239.)

As such, Sprague's testimony clearly shows that Peck was being considered for "other" positions—a tow motor position at the least should one open up—and that Elyria was taking account of Peck's muscular problems and the lack of adequate bathroom facilities in deciding what positions Peck would be best suited to perform. The record further shows that Elyria refused to consider Peck only *after* her attorney drafted the letter threatening to sue. Peck has not challenged the fact that she was removed from a previous grinding position for muscular problems in her arms. Nor has she refuted Elyria's contention that it was renovating the women's facilities. And most significantly, Peck has not introduced evidence rebutting Elyria's contention that it was still considering Peck up to the time Peck's attorney sent the letter. To the contrary, in her own affidavit and brief, Peck

corroborates Sprague's explanation that Elyria was still considering Peck for employment until Peck's attorney threatened legal action. (*See* JA 115; App Br 19-20, 26-27.) Therefore, Peck has placed no evidence on the record that her application was treated differently than similarly situated males by failing to consider her for other positions.

## III.

I agree with the majority's conclusion that the district court analyzed only Elyria's explanations of why it did not hire Peck for the grinding and tow motor positions. I believe, however, that Elyria adequately and undisputedly explained that it was considering Peck for *other* positions once its facilities were completed. And because we review the district court's grant of summary judgment *de novo*, "we may affirm the judgment on grounds other than those employed by the lower court, as long as the party opposing summary judgment is not denied the opportunity to respond." *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 456 n. 2 (2008) (citing *Carver v. Dennis*, 104 F.3d 847, 849 (6th Cir. 1997)). Here, for the reasons discussed above, Peck has failed to rebut Elyria's proffered reasons for deferring consideration of her job application. Therefore, I would affirm the judgment for the reasons stated in my dissent.