NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0526n.06

No. 21-4213

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Dec 19, 2022
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| KELLI NOLAN, ) | |
| ) | |
| Plaintiff-Appellant, ) | ON APPEAL FROM THE |
| ) | UNITED STATES DISTRICT |
| v. ) | COURT FOR THE |
| ) | NORTHERN DISTRICT OF |
| OHIO DEPARTMENT OF REHABILITATION ) | OHIO |
| AND CORRECTION, ) | |
| ) | |
| Defendant Appellee. ) | OPINION |
| ) | |

Before: SILER, BUSH, and READLER, Circuit Judges.

JOHN K. BUSH, Circuit Judge. Kelli Nolan sued the Ohio Department of Rehabilitation

and Correction for unlawful sex discrimination and for retaliation. The parties cross-moved for

summary judgment, and the district court ruled in favor of the Department. Nolan appeals the

district court's grant of summary judgment denying her unlawful discrimination claim. We

AFFIRM.

I.

The Ohio Department of Rehabilitation and Correction (ODRC) is the adult corrections

system for the state of Ohio. To manage its employees and maintain effective supervision of adult

offenders, ODRC has two separate tracks for employee discipline—one based on attendance and

the other, performance. Each track has progressively higher sanctions for additional violations

within the same track.

Kelli Nolan, a current employee at ODRC's Marion Correctional Institution (MCI), violated policies related to both tracks. Nolan acknowledges those violations but claims that the severity of her punishments under each track resulted from unlawful sex discrimination.

A. Removal

The first disciplinary action that Nolan challenged was removal from work. ODRC issued Nolan a Notice of Removal for misconduct related to a state court criminal proceeding.

The series of unfortunate events began with Nolan attending the criminal trial of a friend, Micah McCoy, on December 14, 2018. Nolan left work in her uniform at around 6:30 a.m. that day. MCI policy required that she change out of her uniform once she left the correctional facility. But she had errands to run that prevented her from changing clothes before going to the courthouse. So, when Nolan attended the trial that day, she was still in uniform.

That was not her only mistake. Later, on McCoy's behalf, Nolan called his probation officer, Heather Miller, who also was the Pre-Sentencing Investigation (PSI) Writer for his case. Nolan alleges that she was unaware that Miller was the PSI Writer. Nolan insists that her intent in contacting Miller was simply to obtain information concerning McCoy's sentencing proceeding. However, during the phone conversation, Miller revealed that she was the PSI Writer, to which Nolan responded that she understood what that meant from her work at MCI. Based on their conversation, Miller testified that she "kind of" felt or believed that Nolan was trying to use her position at MCI to influence the outcome for McCoy.

Nolan planned to testify on McCoy's behalf at sentencing. Sometime after McCoy's trial but before his sentencing hearing, Nolan notified MCI officials about their relationship and his pending sentencing. Nolan also filed a report with MCI on December 28—the day after the

sentencing hearing—which disclosed the relationship but did not notify MCI officials that she had been a witness at that hearing.

At the December 27th sentencing, Nolan spoke as a character witness for McCoy. She wore plain clothes to court this time, and she made many statements relevant to eventual discipline by ODRC:

1. "... I've worked for the Ohio Department of Rehabilitation and Correction for 11 years so a lot of [McCoy's] friends are fellow corrections officers at various institutions."
2. "I believe [McCoy] to be a patriot as I am who loves his country and those who serve and protect it whether be green, blue or in my case grey [referring to her ODRC-issued uniform]."
3. "To hear someone say that [McCoy] made a threat towards law enforcement, to me, was absurd and a gross distortion of the truth."
4. "Not long ago myself and my other co-workers and friends of [McCoy's] who work at other institutions, we actually attempted to get him hired on with us with the [ODRC]."
5. "[McCoy] did go through the process of the [ODRC] application."
6. "[McCoy] was very eager to become a Correction Officer and I believe that he would have been an excellent Correction Officer."
7. "[McCoy] has always been a productive and contributing citizen to the community so I ask you to show him leniency."
8. "I don't feel, you know, working in a correctional facility, I don't feel he is gonna [sic] do the community any justice inside a correctional facility."

R.24-1, PageID.1724–25.

Shortly after Nolan testified, the prosecutor in McCoy's case informed MCI that an MCI employee was attempting to interfere with the case. The ODRC warden then called for Investigator Leon Walker to look into the matter. Among other things, Walker interviewed several individuals, including the prosecutor, reviewed photos and audio recordings of the criminal sentencing, and reviewed Nolan's filed incident reports concerning her relationship with McCoy. Walker found that Nolan knowingly violated rules of the Standards of Employee Conduct, including by wearing her uniform to a criminal trial and by disclosing her employment during her testimony on McCoy's behalf.

On February 28, 2019, Officer Patty Finch held a pre-disciplinary hearing to consider Nolan's actions surrounding McCoy's trial and sentencing. The ODRC alleged that Nolan violated the following rules:

1. Rule 7: Failure to follow post orders, administrative regulations, policies, or written or verbal directives.
2. Rule 16: Misusing official position for personal gain, to include but not limited to the accepting or soliciting of bribes in the course of carrying out assigned duties.
3. Rule 21: Unauthorized use, release or misuse of information.
4. Rule 24: Interfering with, failing to cooperate in, or lying in an official investigation or inquiry.
5. Rule 39: Any act that would bring discredit to the employer.

Wainwright Dep., R.22, PageID.1055–56. In addition to these alleged rule violations, ODRC pointed to two key policies that relate to Nolan's conduct. One is its Dress Code Policy, which states:

> All uniformed personnel shall report for work in clean, neat uniforms. Uniformed personnel shall wear the complete uniform at all times while on duty. No uniformed personnel shall wear the uniform or any part of the uniform while off duty, unless the individual is preparing to go on duty or is in the process of leaving the tour of duty. The uniform shall not be worn in any situation that would bring discredit to the agency including, but not limited to, purchasing or drinking alcoholic beverages and entering an establishment that provides gambling/gaming.

*Id.* at PageID.1034. The other is the Public Relations Policy, which requires employees to submit a request form to their managing officer for approval prior to speaking engagements or public relations efforts to an external audience concerning ODRC issues.

In her report, Finch found that Nolan committed the alleged rule violations. Finch noted that Nolan wore her uniform during a criminal trial that was not part of her duties as a correctional officer and that she referenced her work experience when requesting leniency for McCoy at his sentencing hearing. Finch also found that Nolan represented herself as a correctional officer for ODRC and, without permission, made statements in open court concerning ODRC's hiring

practices and procedures. And Finch determined that those actions tarnished ODRC's working relationship with the law enforcement community.

Philip Rader, the Labor Relations Officer, then had the responsibility for making disciplinary recommendations to the warden. Rader recommended that Nolan be fired, and the warden accepted that recommendation, effectively terminating Nolan's employment.

Nolan's union then filed a grievance on her behalf. At the conclusion of the grievance and arbitration procedures, an arbitrator reinstated Nolan as a corrections officer without loss of seniority, but with loss of back pay. The arbitrator determined that Nolan's actions were negligent and worthy of discipline, but that they did not warrant removal. Specifically, the arbitrator found that the record did not reflect that Nolan's actions adversely impacted ODRC's relationship with the law enforcement community, nor did they suggest that Nolan could not learn from the matter or be trusted further as a corrections officer.

B. Suspension

The second disciplinary action was Nolan's suspension from employment. Nolan was late for work on January 30, 2019, because of car trouble. Nolan initially sought sick leave to cover her late arrival, but that request was denied because she was not actually ill. Later, Nolan submitted a request for 1.4 hours of compensatory leave, but she did not have enough compensatory time available.[1]

Lieutenant Williams investigated Nolan's 2019 leave violation. Nolan admitted to being late for work and that she did not have the necessary compensatory time to cover her tardiness. ODRC then conducted a pre-disciplinary hearing concerning Nolan's leave violation. It assigned

---

[1] This was not the first instance that Nolan improperly requested compensatory leave. ODRC previously disciplined Nolan for attempting to use compensatory time that she did not have in March 2015.

a hearing officer, who found that Nolan violated Rule 4A of ODRC's Standards of Employee Conduct, which covers absence without proper authorization for three days or less, including being late for work for more than one hour. Though the report recognized Nolan's mitigating circumstances of having car issues, it also acknowledged that Nolan's prior attendance problems prevented her from having the requisite compensatory leave necessary to cover her unforeseen tardiness. ODRC issued Nolan a two-day suspension for her attendance violation.

C. Litigation

On June 11, 2019, Nolan filed a report with the Equal Employment Opportunity Commission (EEOC) alleging discrimination stemming from the removal and two-day suspension. Upon receipt of a right-to-sue letter from the EEOC, Nolan filed her complaint in the district court, alleging claims that included sex discrimination in violation of Title VII of the Civil Rights Act of 1964. The discrimination allegedly arose when she was disciplined with removal for wearing her uniform to a trial proceeding and given a two-day suspension for violating the attendance policy.[2] Nolan alleged that, on multiple occasions, Rader had recommended harsher discipline for female officers than their male counterparts and that, consistent with this practice, he recommended with a discriminatory purpose that Nolan be fired. She further alleged that ODRC terminated her employment for pre-textual reasons because of her gender in violation of 42 USC § 2000(e).

Following the parties' cross-motions for summary judgment, the district court ruled in ODRC's favor. Relevant here, the district court found that Nolan failed to establish her prima facie case of unlawful discrimination as required by *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1975). In particular, the district court held that she failed to demonstrate that similarly

---

[2] Nolan also alleged that she was subjected to discriminatory treatment stemming from discipline for cursing and that she was subjected to retaliation after reporting her claims to the EEOC. Because Nolan does not appeal decisions related to those issues, we decline to address them here.

situated non-protected employees were treated more favorably and failed to introduce direct evidence of discrimination based on her sex. Thus, the district court determined that no reasonable jury could conclude that the ODRC had any discriminatory animus, let alone that such animus motivated its decision to discipline her.

Nolan filed a timely appeal.

## II.

We review a district court's grant or denial of summary judgment de novo. *DePiero v. City of Macedonia*, 180 F.3d 770, 776 (6th Cir. 1999) (citation omitted). We affirm summary judgment when "there are no issues of material fact in dispute and the moving party is entitled to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(c)). When inferences may be fairly drawn from the underlying facts, those inferences "must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). But this Court "does not weigh the evidence or make credibility judgments when reviewing a summary judgment motion." *Spratt v. FCA US LLC*, 812 F. App'x 348, 355 (6th Cir. 2020).

The party opposing a granted motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Indeed, it "must present 'affirmative evidence' to support his/her position; a mere 'scintilla of evidence' is insufficient." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584 (6th Cir. 1992) (quoting *Anderson*, 477 U.S. at 252).

At the summary judgment stage, courts should not allow cases with burden-shifting analyses such as this one to "obfuscate the appropriate question—whether there exists a genuine issue of material fact." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011).

There must be evidence from which a jury could reasonably find in favor of the plaintiff. *Anderson*, 477 U.S. at 252.

III.

To establish a prima facie case of sex discrimination because of unequal treatment, the plaintiff must prove "(1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) . . . similarly situated non-protected employees were treated more favorably." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016) (quoting *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004)). The plaintiff has the initial burden of establishing a prima facie case by a preponderance of the evidence. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). The evidence must be of the kind from which a reasonable jury could find in favor of the plaintiff. *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 807 (6th Cir. 2020).

After establishing a prima facie case, the burden "shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 562 (6th Cir. 2000) (citing *Green*, 411 U.S. at 802–03). If the defendant's burden is met, the plaintiff then must demonstrate that the defendant's reasons are a pretext for discrimination. *Id.* Therefore, our inquiry necessarily "asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict . . . ." *Anderson*, 477 U.S. at 252.

The parties do not dispute that Nolan satisfied the first three elements set forth above. What is left, then, is the fourth element—the comparator analysis, which requires that Nolan show she was similarly situated to male employees who were treated more favorably. To be a proper comparator, the non-protected employee "need not be identical in every way." *Tennial v. United*

*Parcel Serv., Inc.*, 840 F.3d 292, 304 (6th Cir. 2016). The key is that the two employees are "similar in 'all of the relevant aspects.'" *Seay v. Tennessee Valley Authority*, 339 F.3d 454, 480 (6th Cir. 2003) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). These "relevant aspects," though nominally factors, must each be independently satisfied to determine whether the plaintiff and the alleged comparator are similarly situated: "the individuals with whom the plaintiff seeks to compare his/her treatment must have [1] dealt with the same supervisor, [2] have been subject to the same standards and [3] have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Jackson*, 814 F.3d at 777 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). For the third prong, we consider "the type, circumstances, and respective severity of the misconduct alleged." *Spratt*, 812 F. App'x at 355 (citing *Jackson*, 814 F.3d at 780–83).

Nolan alleges that former ODRC officers Dustin Smith and Ryan Pakish are adequate comparators. We address each in turn.

A. Dustin Smith

Dustin Smith was a corrections officer who was disciplined for violating ODRC's Dress Code Policy. Smith wore his full uniform to an establishment that serves pizza and alcohol, among other things. There Smith had dinner with his wife, infant daughter, and two adults. After an investigation, ODRC determined that Smith violated Rule 7 (failure to follow post orders, administrative regulations, polices, or written or verbal directives) when he wore his uniform while eating at a restaurant. Smith received only a written reprimand since it was his first discipline under the performance track of the ODRC's rules.

Nolan argues that Smith is an adequate comparator because he was subject to more favorable treatment than her for the same offense—violating Rule 7 for wearing the full uniform off duty. What's more, Nolan notes that the same person who investigated her, Leon Walker, conducted Smith's initial investigation. Yet, according to Nolan, Walker did not conduct the same level of inquiry for Smith. Walker testified: "It didn't warrant a serious enough offense for me to consider it to be something I would [investigate] . . . . [U]pon talking with the owners of the place and reviewing the video and getting kind of a snapshot of the video, that was it." Walker Dep., R.20, PageID.589–90. Nolan argues that Walker treated Smith more favorably than her, despite their conduct being similar.

We find Nolan's argument unpersuasive. To be sure, there were some similarities between Nolan's and Smith's violations. They had the same investigator (Walker) for violating the same rule, and, in both instances, Walker followed similar steps, interviewing people who might have more information and reviewing relevant video and audio recordings. But the findings of the investigations revealed significant differences between the two officers' respective situations. Smith only wore his uniform outside of work to have dinner and the investigation did not reveal any instance where Smith tried to use his uniform or position of authority to obtain anything for himself or others. Nolan, on the other hand, was reported to have not only worn her uniform in public, but also to have used her employment to seek a favorable sentence for McCoy. Unlike his findings with respect to Smith, Walker determined that Nolan not only violated Rule 7 (Smith's only violation), but also contravened Rules 16, 21, 24, and 39 by disclosing her employment when she spoke with the probation officer in McCoy's case and by testifying during McCoy's sentencing.

Nolan argues alternatively that ODRC failed to investigate whether Smith violated a second rule by purchasing or consuming alcoholic beverages while in uniform. But there was no evidence of Smith purchasing or consuming alcohol. Mere speculation or allegation is insufficient to establish a comparator; Nolan must present evidence from which a reasonable jury could rule in her favor, a burden that she has failed to carry here. *Anderson*, 477 U.S. at 252.

B. Ryan Pakish

Ryan Pakish was a corrections officer who was repeatedly late to work. Pakish violated the attendance policy twice in the same week: once on September 15, 2018, and the other time three days later. For these violations, Pakish was issued only a written reprimand.

Nolan argues that she and Pakish were similarly situated because they both committed the same misconduct—being late for work two times. Yet Nolan received a two-day suspension, while Pakish received only a written reprimand.

When determining whether the conduct was substantially identical, we look not only to the rule violated but also the type, severity, and circumstances of the conduct. *Spratt*, 812 F. App'x at 355. Here the conduct clearly was similar in the type and severity, but the circumstances were different. ODRC's policy allows for consideration of "circumstances which may mitigate or aggravate a penalty." R.24-1, PageID.1632. In accordance with its progressive discipline policy, ODRC requires consideration of "the similarity and proximity in time of offenses when contemplating employee disciplinary action." *Id.* at PageID.1633. In this vein ODRC "*may* repeat disciplinary penalties for repeat violations of a similar nature when offenses occur in *close proximity in time*." *Id.* (emphasis added).

Here, ODRC acted within its discretion to issue Pakish a single written reprimand for two attendance policy violations that occurred within the same week. Nolan's late arrivals to work,

though violating the same rule, occurred more than a year apart. In fact, Nolan's initial written reprimand in March 2015 was similar to Pakish's in that ODRC issued her a single written reprimand for two attendance policy violations that occurred approximately one month apart. Also, ODRC considered mitigating and aggravating circumstances before issuing Nolan a two-day suspension. The report acknowledged the car trouble Nolan had that morning as a mitigating factor, but also noted repeated attendance issues that led to her latest violation. Thus, Nolan has not presented evidence from which a reasonable jury could find in her favor that Pakish is a valid comparator.

IV.

Nolan's failure to provide evidence of similarly situated comparators appears to be fatal to her prima facia case. That being said, a part of Nolan's comparator argument hinges on the possibility that ODRC disingenuously accused Nolan of violating Rules 16, 21, 24, and 39. If this were true, drawing inferences in a light most favorable to Nolan would suggest that she was indeed similarly situated to Smith in that they both violated only Rule 7 when they wore their uniform outside of work. *See Matsushita Elec.*, 475 U.S. at 587.

ODRC counters that Nolan's conduct clearly violated additional rules. The additional rules relate to ODRC's Public Relations Policy, which includes rules that prohibit employees from misusing their official position for personal gain and from acting in ways that would discredit ODRC. ODRC argues that Nolan violated these rules when she (1) in full uniform, took notes for McCoy at the criminal trial and conferred with him during breaks, (2) contacted McCoy's PSI writer after his criminal trial and indicated that she worked at the ODRC in order to gain favor for McCoy, and (3) testified as a character witness at McCoy's sentencing hearing, when she again disclosed her employment as she sought favorable treatment for McCoy.

Nolan has three interrelated avenues for establishing pretext: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (cleaned up). The heart of that inquiry is to determine whether ODRC proffered reasons to conceal intentional discrimination. *See id.* This burden, therefore, "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256. On summary judgment, "[i]n evaluating pretext and the plaintiff's ultimate burden, the court should consider all [probative] evidence in the light most favorable to the plaintiff, including the evidence presented in the prima facie stage." *Jackson*, 814 F.3d at 779 (quoting *Provenzano*, 663 F.3d at 812).

Yet, an employee cannot establish pretext "as long as an employer has an honest belief in its proffered nondiscriminatory reason," even if that proffered reason ultimately is incorrect. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998)). The honest belief rule seeks to determine "whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Smith*, 155 F.3d at 807. The employer's decisional process need not "be optimal or [leave] no stone unturned." *Id.* Rather, the employer must have had an honest belief in its reasoning when it relied "on the particularized facts that were before it at the time the decision was made." *Id.* The plaintiff must then produce "evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001) (citing *Smith*, 155 F.3d at 806–07). Should the plaintiff fail to rebut properly the employer's honest belief

defense, the employer is entitled to summary judgment. *See Jones v. St. Jude Med. S.C., Inc.*, 504 F. App'x 473, 477 (6th Cir. 2012).

Nolan argues that the additional rule violations were pretext for two primary reasons. First, nowhere in the ODRC's employee manual is there a rule that explicitly forbids employees from testifying in court; nor is there a rule that prohibits an employee from disclosing to the public her place of employment. As evidence of this, Nolan cites an exchange from the warden's deposition concerning employee conduct in public:

> Q: . . . is there a policy that would disallow [an employee] from testifying on behalf of their relative for sentencing reasons?
>
> A: No.
>
> . . . .
>
> Q: And is there a policy written by the ODRC that you know of that prohibits an employee at the department who works for the ODRC from indicating in any public forum where they're employed?
>
> A: No, they can state where they're employed.

Wainwright Dep., R.22, PageID.945–46, 950. Thus, according to Nolan, she did not violate any rules when she participated in McCoy's proceedings. Second, Nolan points to her arbitration award as evidence that ODRC lacked just cause to remove her for the alleged rule violations.

Nolan has failed to present sufficient evidence to support her pretext argument. First, the warden's deposition does not provide proof to rebut the conclusion that ODRC honestly believed that Nolan violated several rules by testifying at the sentencing hearing. Though the warden stated that an employee can testify in court and can reference employment at the ODRC in public without warranting removal, the deposition reveals nothing concerning whether an employee can reference her employment at a sentencing hearing to gain favorable treatment on behalf of another. Second, while the arbitrator reversed ODRC's removal of Nolan, he concluded that Nolan's conduct

violated multiple rules. Though removal may have been too severe, the arbitrator nevertheless agreed that Nolan's actions were negligent, calling for fourteen months without backpay. Even if ODRC's final disposition was in error, Nolan has not carried her burden of presenting evidence to disprove ODRC's honest belief that her rule violations warranted removal.

V.

For the foregoing reasons we AFFIRM the district court's grant of summary judgment for the defendants.